```
               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

JOHN J. CARNEY                  :  No. 3:12cv-182 (SRU)
                                :  915 Lafayette Boulevard
          vs.                   :  Bridgeport, Connecticut
                                :
                                :  November 20, 2012
FRANCISCO LOPEZ, ET AL          :

- - - - - - - - - - - - - - - - x


                       MOTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          BAKER & HOSTETLER, LLP
               45 Rockefeller Plaza
               New York, New York  10111
          BY:  JONATHAN B. NEW, ESQ.
               ROBERTSON D. BECKERLEGGE, ESQ.

     FOR THE DEFENDANTS:

          ROBINSON & COLE
               One Commercial Plaza
               280 Trumbull Street
               Hartford, Connecticut 06103-3597
          BY:  CRAIG A. RAABE, ESQ.
               JOSIAH T.D. BUTTS, ESQ.

          SANTOS & SEELEY
               51 Russ Street
               Hartford, Connecticut  06106
          BY:  HOPE C. SEELEY, ESQ.


                                    (CONTINUED)
```

```
LYNCH, TRAUB, KEEFE AND ERRANTE
     52 Trumbull Street
     New Haven, Connecticut 06506
BY:  MATTHEW D. POPILOWSKI, ESQ.


FINN, DIXON & HERLING
     177 Broad Street, 15th FL
     Stamford, Connecticut  06901-2048
BY:  MICHAEL Q. ENGLISH, ESQ.
     RICHARD S. GORA, ESQ.
     ALFRED U. PAVLIS, ESQ.

COWDERY, ECKER & MURPHY
     280 Trumbull Street, 22nd Floor
     Hartford, Connecticut  06103
BY:  THOMAS J. MURPHY, ESQ.
     GAVAN F.P. MEEHAN, ESQ.


          Susan E. Catucci, RMR
          Official Court Reporter
          915 Lafayette Boulevard
      Bridgeport, Connecticut  06604
            Tel: (917)703-0761
```

```
 1                    (2:45 O'CLOCK P. M.)

 2            THE COURT:  Good afternoon.  We're here in

 3   Carney versus Lopez.  Could I have appearances, please?

 4            MR. NEW:  Good afternoon again, Your Honor.

 5   Jonathan New and Robert Beckerlegge on behalf of

 6   Mr. Carney, the Receiver.

 7            THE COURT:  Very good.

 8            MR. RAABE:  Good afternoon, Your Honor.  Craig

 9   Raabe, Robinson & Cole, Josiah Butts and Hope Seeley for

10   Frank Lopez.

11            THE COURT:  Very good, thank you.

12            MR. POPILOWSKI:  Good afternoon, Your Honor.

13   Matthew Popilowski for Mr. Lopez Pelaez and Mr. Araya.

14            MR. PAVLIS:  Alfred Pavlis and Richard Gora for

15   Mr. Christopher Luth.

16            MR. MURPHY:  Good afternoon, Your Honor.  Thomas

17   Murphy and Gavan Meehan on behalf of Victor Chong.

18            THE COURT:  Okay, thank you.  And we are here

19   obviously on the motions to dismiss and strike.

20            Who's going to take the lead?

21            MR. RAABE:  I'll give an opening, Your Honor.

22            THE COURT:  All right.

23            MR. RAABE:  Craig Raabe for Mr. Lopez.

24            Your Honor, this is a case of fraudulent fluff.

25   What we're trying to do is get rid of the fluff and really
```

1    to get to what this case is all about.

2           I think the Receiver's got a live one here in

3    Mr. Illarramendi.  He's admitted to fraud.  He's not

4    admitted to a Ponzi scheme but he's admitted to fraud, and

5    the Receiver in paragraph two of his complaint has

6    basically said that he's going to go after anyone he can

7    find to try to get them to pay for Mr. Illarramendi's

8    fraud.

9           The fraud allegations are conclusory, ambiguous,

10   and implausible, which I'll explain in a bit.  You've seen

11   the briefing, I'm sure.  There's some great dispute over

12   the controlling law in this case.  Unfortunately I think

13   the only solution for you to that is to read the cases and

14   figure out who's got it right.

15          We obviously believe that we do.  This isn't a

16   case of fraud.  Even if you read the complaint in a

17   favorable light, it's a case about corporate management.

18          The allegations are that, paragraph 77, that

19   these three defendants had access to the books and should

20   have seen where the cash was going and figured it out and

21   stopped it.

22          I think if you read two allegations together,

23   paragraph 77 -- I'll just read through it somewhat

24   quickly.  They all had access to the books and then, as

25   fiduciaries, they had a duty to follow the purported flow

1    of funds in and out of these entities and act in a manner

2    consistent with their fiduciary duties.

3           And you tie that, Your Honor, to paragraph 170

4    which is the fiduciary duty allegation, and that

5    allegation is so broad as to be incomprehensible for these

6    defendants to be able to answer.

7           It alleges that the defendants misused corporate

8    assets, engaged in self dealing, mismanagement, corporate

9    waste, failure to prepare, implement and carry out

10   complaints and supervisory responsibilities and policies,

11   failure to read red flags and failure of their duty to act

12   with care, loyalty and good faith and fair dealing, as

13   described above.

14          The "described above" is the problem here, Your

15   Honor.  Now, the complaint is amended to add a couple of

16   individual examples of conduct of these three defendants,

17   and with Mr. Lopez, it's about two bits of conduct.  This

18   allegation is far broader than those two pieces.

19          So, what we believe the Receiver has done is

20   tried to cloak this in a fraud, so he doesn't have to

21   connect any particular money transfers to any particular

22   harm.  He says it's all part of a Ponzi scheme, all part

23   of a fraud, and therefore, these three defendants are

24   liable for 35 million-dollars' worth of compensation and

25   payments that were made to them.  We believe, Your Honor,

1    that that's an overstatement of the law.

2         Because there are no supporting facts, the

3    Receiver has jumped on this Ponzi scheme theory.  Twenty

4    times in the complaint there's an allegation that there is

5    a Ponzi scheme, but there's no case law to support that

6    theory.  I think Mr. Ponzi's probably rolling in his grave

7    to be associated with this fraud.

8         A Ponzi scheme, by definition, in every case

9    that we found, is money comes in and is paid out to

10   subsequent investors with no legitimate investments, no

11   legitimate purpose.  It's just a big illusion.  And after

12   a while, it collapses on its own weight.

13        There's no case law supporting it, and this

14   Receiver knows that factually there's no support for it.

15   He knows that Mr. Illarramendi, his main witness, has

16   sworn under oath that he did not engage in a Ponzi scheme,

17   and important to these defendants, that he acted alone.

18        What he has said in an affidavit that we

19   attached to the reply brief, that he acted alone with two

20   exceptions, with Mr. Zerpa and Mr. Horna -- who I believe

21   the Court is familiar with from having sentenced them --

22   not acting at all with these folks with regard to a fraud.

23        It goes beyond that, Your Honor.  Arguing this

24   motion, and in its memorandum, the Receiver alleges that

25   Mr. Illarramendi admitted in his criminal case that he

1    engaged in a Ponzi scheme.  We urge the Court to look

2    through the plea proceedings and everything connected to

3    it.  There is no allegation and no admission of a Ponzi

4    scheme there, and for the Receiver to allege that

5    Mr. Illarramendi has admitted that for purposes of

6    defeating this motion, we believe is inappropriate.

7          THE COURT:  Let me make sure I understand.

8    You're basically saying that a Ponzi scheme, to be a Ponzi

9    scheme, a scheme has to be completely fraudulent, that is,

10   there is no value in investment.  I think what the

11   Receiver's theory, as I understand it, is is that

12   Illarramendi made a bad investment and got himself in deep

13   and was trying to fill that in, and he was filling it in

14   with new money, if you will.

15         MR. RAABE:  Sure.  That's a classic fraud.

16         THE COURT:  It's classic fraud, but it's in the

17   nature of a Ponzi scheme because the new money's paying

18   off the old money, if you will.  Even though there's some

19   investment value to what he was doing, he was -- he was

20   trying to make up trade and loss by bringing in new money

21   that was then used at least in part to pay off the old

22   money.

23         MR. RAABE:  I think you're right, that's how

24   they charactered it.  So then, in any instance where

25   someone engages in fraud and then continues to try to

1    raise monies to fill in the fraud but the hole is too big,

2    to use their term, it converts into a Ponzi scheme.  When

3    you read the case law, the Carrasola (ph) case that we

4    cited and the others, they talk about there being no

5    legitimate investment purpose.

6           And I think what's clear, even from the

7    allegations here, when this entity was started in 2004, it

8    was engaged in legitimate investments.  Throughout the

9    course, they talk about there being nominally profitable

10   investments.  I don't think, under any strain of the Ponzi

11   scheme law, this could be considered a Ponzi scheme.

12          And obviously the reason that the Receiver wants

13   it to be a labeled a Ponzi scheme is because there are

14   pleading issues and he wants to take advantage of the

15   Ponzi presumption to get around what we think Rule 8, Rule

16   9 and the requirements in pleading the badges of fraud to

17   really establish that these defendants were engaged in a

18   fraud.  We think it's inappropriate.

19          So, on that issue, Your Honor, on the fraud

20   issue, as I said, we believe the fraud is fluff and we

21   believe that the allegations are so inconsistent and

22   ambiguous, that under Iqbal and Twombly, the case should

23   not proceed.

24          So let me just give you a couple examples.

25   We've talked about the law in the case.  Let me just

1    highlight some of the examples.

2            With regard to Mr. Lopez, kind of the

3    centerpiece allegation we understand against Mr. Lopez now

4    is Mr. Illarramendi told him of the hole, and, therefore,

5    he's a fraudulent participant.  So, the allegation in

6    paragraph 37 is that the hole was created in October of

7    2005.

8            In paragraph 56, the Receiver alleges that Lopez

9    was the director of a holding company of BCT bank and he

10   alleges that he, quote, "controlled the bank as a director

11   of the holding company."  Under the federal pleadings

12   standards, that is a conclusion, that is not a fact.  You

13   have to allege facts to establish the control.  You simply

14   can't say it's so.

15           Consistent with their theme that this is a fraud

16   Mr. Lopez participated in, paragraph 98, they say in

17   November of 2005, BCT Bank, the bank which supposedly

18   Mr. Lopez controlled, loaned 5 million-dollars, quote, "to

19   execute the fraudulent scheme."

20           It all comes apart in paragraph 52, where they

21   allege that Mr. Lopez didn't learn of the supposed hole

22   until the Summer of 2006, almost a year later.  He can't

23   be participating in a fraud with his bank relationship

24   when he doesn't know about the fraud.

25           With regard to Mr. Lopez's state of mind

1    generally, there's inconsistencies in the complaint and in

2    the memorandum that the Receiver has filed.

3            With regard to the complaint, they allege that,

4    paragraph one, that the defendants were integral in

5    helping to sustain and conceal the fraud.  Knowing acts.

6            Paragraph three, they looted the funds to enrich

7    themselves.

8            Paragraph 49, they knew that proceeds were

9    commingled and misappropriated.

10           But then subsequently, paragraph 117, they turn

11   into a "should have known" allegation.

12           In paragraph 118, they turn it into a "failed to

13   make sufficient inquire" allegation.

14           So, these defendants have to sit here and figure

15   out, are we being accused of knowing violations or being

16   accused of negligence or being accused of breach of

17   fiduciary duty, and what are the facts to support any of

18   that.

19           It continues in the briefing, page two, "The

20   defendants looted assets."  Page three, they concealed the

21   fraud, actively concealed the fraud with regard to

22   Mr. Lopez.  Page five, note two, he was aware of the fraud

23   from its inception, which of course is inconsistent with

24   the allegation that he didn't learn about it until a year

25   later in the Summer of 2006.  And paragraph -- page 34 and

1    35, "They were participating in the fraudulent enterprise,

2    active participants in the fraud."  And page 27 of the

3    memorandum, "The Receiver has not suggested that the

4    defendants were co-conspirators of Illarramendi and

5    operating in the fraudulent scheme," which is inconsistent

6    with all of the other paragraphs.

7            We cannot figure out what we are alleged to have

8    done here and, therefore, cannot respond.

9            So, when you get down to the facts to supposedly

10   support this knowing misconduct, paragraph 41, there is a

11   conclusory allegation that bank accounts were commingled.

12   What accounts?  How much?  There are a number of funds

13   involved here, a number of companies involved here.  You

14   can't simply say is there were commingling of two funds

15   and, therefore, for all of the funds, we get to take back

16   all of your pay, all of your bonuses, any compensation

17   paid to you.

18           Paragraph 49, investor proceeds were being

19   freely commingled.  Which investors?  How much?  When?

20   There's none of that in the complaint.

21           Paragraph 55, "Frank Lopez was encouraging the

22   fraud to continue."  How?  All it says is "encouraging the

23   fraud to continue."  There's no explanation of who, how,

24   when, where, why.

25           In paragraph 63 and paragraph 55, "Email

1    correspondence reveals, email correspondence indicates."

2    In a fraud case you have to allege who is speaking, to

3    whom, when, where, what they are saying.  They can't

4    simply say there's an email out there that supports my

5    fraud theory.

6            Paragraph 110.  This one is important.  "While

7    some individual transactions engaged in by HVP Partners

8    might have yielded a profit upon information and belief,

9    HVP Partners and the HVP funds it oversaw were insolvent

10   at all relevant times."  They've got to allege the

11   insolvency if they want to create this illusion of a Ponzi

12   scheme, which is in itself an illusion.  But they allege

13   it on information and belief, which this Court does not

14   have to accept for purposes of a motion to dismiss.

15           And it's also internally inconsistent.  If the

16   investments might have yielded a profit, they were not

17   insolvent.  We don't know what funds they are talking

18   about, to what degree, and we can't respond.

19           There's also implausible allegations throughout

20   the complaint.  Paragraph 67 to 71, again, one of the

21   instances they allege with regard to Mr. Lopez is that

22   there was an unauthorized early redemption, but when you

23   read through those paragraphs, you see there was never any

24   harm or any loss to any of the funds.  It alleges an early

25   redemption that was paid back to the fund.

1           They assert that in 2009 and 2010,

2   Mr. Illarramendi testified that he had told -- I'm sorry,

3   this is from the transcript from one of the hearings that

4   we had appended -- in 2009, 2010, Mr. Illarramendi

5   testified that he made his trades look legitimate to his

6   business partners.  But they allege that in 2006 he had

7   told Mr. Lopez that there was a hole.  Why is he telling

8   them they are legitimate in '9 and '10 if he's telling

9   them there was a hole in 2006?  There's an inconsistency

10  there that I can't reconcile and I don't know how to

11  respond to it.

12          With regard to the actually investing, they say

13  in paragraph 36 that Mr. Lopez and the others had absolute

14  investment and contracting power over the fund.  But

15  there's no discussion in the complaint about Mr. Lopez

16  actually making trades, about Mr. Lopez engaging in fraud

17  with regard to the transactions at play here.

18          What there is, in paragraph 26, contrary to the

19  allegation about Mr. Lopez having absolute investment

20  authority, is that Mr. Illarramendi had domination and

21  control, and then the allegations about all of the trades

22  that he did, trying to have wrap those trades into Mr.

23  Lopez by an allegation that he had absolute investment

24  power but no facts to support that.

25          So, again, Your Honor, I think that the reason

1       we got all this fluff in there without supporting facts is

2       to try to get around the pleading requirements.  We have

3       briefed the issues, but when it comes down the core with

4       regard to, especially the first four counts, the

5       fraudulent counts, it's to avoid having to allege what are

6       called the badges of fraud in both the statute and the

7       case law, the Sharp case, for instance.

8               We don't believe that it's an appropriate tactic

9       for them to do that.  We need, especially in a case of

10      fraud, we need particularized facts showing the who, when,

11      why and where.  And to allege a couple of instances of

12      people doing conduct that the Receiver says was

13      inappropriate and then wrapping that into a breach of

14      fiduciary duty claim that covers every act that they ever

15      engaged in, right, wrong or indifferent, is inappropriate

16      pleading, does not provide sufficient notice for us and we

17      cannot respond.  Therefore, we move to dismiss and move to

18      strike the allegations as set forth in the memorandum.

19              THE COURT:  All right.  Thank you.  Why don't we

20      hear from all the defendants and then we'll just get a

21      generals response.

22              MR. POPILOWSKI:  Good afternoon, Your Honor.

23      Matthew Popilowski for Ms. Lopez Pelaez and Mr. Barrantes

24      Araya.  Your Honor, the argument, oral argument I'm going

25      to make now is just going to be focused on the personal

1    jurisdiction issue.

2           The sum total of the allegations against my

3    clients are that they are related by blood or marriage to

4    Frank Lopez, that they either individually or jointly hold

5    a bank account in New York or Florida, and that money was

6    transferred to that account -- to those accounts.

7           Not among the acts are there any allegations

8    that they caused those transfers having diverted funds

9    from those accounts, nor that they are in possession of

10   funds that were transferred into those accounts.  So, to

11   the extent that the receivership statute extends to

12   property found in other districts, there's no allegation

13   that the property is found there; simply that they hold

14   accounts there.  And we don't believe that that's enough,

15   along with the other allegations, to find personal

16   jurisdiction over our clients.

17          I know the argument was made in the previous

18   case, and it's at issue here, is the use of the long arm

19   statutes of Florida or New York to get jurisdiction over

20   my clients.  With respect to the Connecticut long arm

21   statute, we don't believe there's any allegations to tie

22   our clients to the District of Connecticut, so we don't

23   believe any type of minimum contact analysis would apply

24   there and bring them into the jurisdiction of this court

25   under the Connecticut long arm statute.

```
1              With respect to Florida and New York, again, the
2       only allegations there are maintenance -- and not even
3       maintenance, but that they hold a bank account in those
4       jurisdictions.  And under each of these jurisdictions,
5       that is simply not enough in order to establish
6       jurisdiction over my clients.
7              THE COURT:  Help me understand your argument
8       under the receivership statute.  On the receivership
9       statute -- help me understand your argument.  You say that
10      they hold these accounts.  Is the argument that there's
11      not been any allegation that these are receivership
12      assets, or --
13             MR. POPILOWSKI:  Well, that's certainly part of
14      the argument, is that there's no claim that the
15      receivership assets are in these accounts.  They haven't
16      been identified.  The statute setting jurisdiction under
17      receivership statute only applies to property which is
18      found in other jurisdictions.  We have no claim that that
19      property is found in these different jurisdictions.
20             THE COURT:  Okay, I'm not following that.  They
21      have accounts which have money in them.
22             MR. POPILOWSKI:  That's their claim, yes.
23             THE COURT:  That money is property.
24             MR. POPILOWSKI:  Yes.
25             THE COURT:  That property is wherever it is,
```

1    Florida or New York.

2             MR. POPILOWSKI:  It's --

3             THE COURT:  And so how is that property not

4    found --

5             MR. POPILOWSKI:  Well, the claim is that these

6    transfers were made years ago, and there's been no

7    indication, allegation that that property, those transfers

8    that were made years ago, are in these accounts.  There's

9    no allegation as to how much money is in these accounts.

10            THE COURT:  All right.  So, so you're saying

11   basically lack of specificity?  I'm not sure what the

12   argument is there.  They got a bank account into which

13   assets are transferred; are you saying we don't know that

14   the assets are still there?

15            MR. POPILOWSKI:  None of the assets have been

16   identified to be in that account, yes.

17            THE COURT:  Okay.  None of the receivership

18   assets.

19            MR. POPILOWSKI:  Correct.

20            THE COURT:  Got it, okay.

21            MR. POPILOWSKI:  The second part is that to rely

22   on long arm statutes of Florida or New York, again,

23   there's no decisions other than those in Florida that

24   support the extension of jurisdiction using other states'

25   long arm statutes.  Even if those long arm statutes were

1   to apply, the allegation is simply that they hold those

2   accounts, so we don't have any allegation that they

3   transferred -- it's not alleged that they caused the

4   transfer into their accounts, then they transferred money

5   out of their account, the receivership assets out of their

6   account.  It's simply that they hold those accounts.  So

7   their purposeful availment, if any, is in holding those

8   accounts and we don't believe that's enough to extend

9   personal jurisdiction over them.

10              THE COURT:  Okay.

11              MR. POPILOWSKI:  And the case law supports,

12  certainly in Florida, and we did point out in our brief

13  that that issue was certified to the New York state court.

14  But the Florida long arm statute requires strict

15  construction in favor of the defendants, although the

16  receivership claims they should be given benefit of the

17  doubt as to the application of that.

18              And we would also request that in the absence of

19  a prima facie case, that further jurisdictional discovery

20  be denied.  The whole reason to -- that they are held to

21  the standard at this point of making a prima facie case is

22  that no jurisdictional discovery has taken place.  To

23  simply file the complaint, make grandiose allegations

24  trying to get our clients into this court, which we don't

25  believe support personal jurisdiction, shouldn't be a

1    stepping stone to continue discovery to try to get

2    jurisdiction over my clients.

3              THE COURT:  Okay.

4              MR. POPILOWSKI:  Thank you.

5              THE COURT:  Thank you.

6              MR. PAVLIS:  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon.

8              MR. PAVLIS:  I represent Chris Luth, who was

9    also a member of -- one of the three members of High View

10   Point Partners.  I would like to just touch on a few

11   points briefly, Your Honor.  Otherwise we'll be resting on

12   our briefs.  But there's one concept that I do want to

13   emphasize, which I hope the Court will take into

14   consideration when it reviews the complaint towards

15   rendering a decision.

16              In the typical case, the plaintiff has very

17   limited access to information, particularly at the motion

18   to dismiss stage and the Court, decisions obviously grant

19   some leniency or consideration to a plaintiff who's in

20   that position.  This is not the typical case.  I think I

21   would submit we're in a situation that's the exact

22   opposite.

23              Here, the Receiver took control of High View

24   Point Partners.  For one year it had full access to the

25   offices, the records, the emails, the files, had the

1    ability, open access to all the records of High View Point

2    Partners.

3          In addition, it had access to witnesses.  Most

4    importantly, it had access to Mr. Illarramendi, who's the

5    self confessed person who carried out the fraudulent

6    scheme.  In addition, they've had access to other

7    witnesses, including people who were employed at High View

8    Point Partners who worked under Mr. Illarramendi,

9    Mr. Luth.  So, they've had a wealth of information to work

10   with.

11         So, for that reason, I think the complaint and

12   the allegations, or I would submit the lack of

13   allegations, the lack of specific factual allegations, is

14   telling, and the Court should scrutinize the complaint

15   with that concept in mind, because when you read the

16   complaint, one would expect, given the access particularly

17   to Mr. Illarramendi, that there would be more detail.

18   Particularly if they're going to make serious allegation

19   that payments to my client were done to sustain and

20   conceal this fraud, one would expect there would be some

21   detail, factual -- specific factual detail to support

22   that.

23         The Receiver -- this is a very serious case for

24   my client.  The Receiver is seeking every single penny

25   that he earned over six years of employment at High View

1    Point Partners.  If they obtain a judgment from him in

2    that amount, it would bankrupt him and his family.  And

3    one would expect more detail given the access to

4    information they've had in the complaint, particularly on

5    the allegations that they are making, which most centrally

6    is, well, what was the purpose of these payments to

7    Mr. Luth?  If they claim they were done to sustain and

8    conceal the fraud, what does Mr. Illarramendi say about

9    that?  If he supports that theory, presumably that would

10   be pled in the complaint.  And when you read the

11   complaint, it's shockingly silent on these issues, and for

12   us in our position, it's highly frustrating.

13        Because on the one hand, the complaint incants

14   all the boilerplate, all these, you know, grandiose, very

15   damning statements, but there's absolutely literally zero

16   factual detail to support the central issues of what was

17   the purpose of the payments, how did the payments further

18   and conceal the scheme, what was Mr. Luth doing at the

19   firm?  All they say is he was a portfolio manager.  They

20   know from the records that Mr. Luth was actively trading

21   his own portfolio, real live merging market debt in

22   numerous countries traded with real live brokers, making

23   profits, maybe making some losses on some trades, but

24   making profits and I submit at the end of the day they

25   have to show that overall his portfolio was profitable,

1    but they don't address any of that because it's not

2    convenient for their theory.

3          But that is directly relevant to the allegation,

4    some of the allegations they are making, which is was

5    there a reasonably equivalent value for the payments for

6    services provided.  The complaint is absolutely silent on

7    that and they have access to the information.

8          And, quite frankly, when it's a court appointed

9    receiver who's receiving millions of dollars in fees, one

10   would expect, I submit, more candor than a normal

11   plaintiff.  But instead, as I said, the complaint fails to

12   plead any facts that are relevant to these central themes,

13   particularly the themes, the central issue of fraudulent

14   conveyance.

15         In addition, Your Honor, I would point out that

16   tying, pleading facts that show how the payments

17   themselves, that is, the payments to Mr. Luth, were in

18   furtherance of the alleged scheme, is essential.  That is

19   the heart of the Second Circuit's decision in Sharp which

20   we've cited in our brief.

21         There, there was no dispute about basically a

22   real live Ponzi scheme, money coming in, money going out.

23   There was no really no dispute about that, and the Second

24   Circuit said no, you need to show -- that's not

25   sufficient, you need to show how the payments to the

1    defendant at issue were in furtherance of the overall

2    scheme, and that's lacking here.

3          And one point, Your Honor, that I think

4    highlights the cast or fashion in which this complaint has

5    been pled is that they acknowledge in the complaint that

6    the scheme began in late 2005 when Mr. Illarramendi had

7    this trade that put him in a hole, but they are seeking,

8    they are seeking salary payments that began I think seven

9    months before that, every single salary that was paid to

10   Mr. Luth even before the alleged problem began.

11         And then they are seeking the payments after.

12   And you can see, just looking at the schedule of payment,

13   it's the same salary payment.  Why should there be any

14   presumption that there was anything irregular about those

15   payments and they should be clawed back?

16         So, Your Honor, finally, what you'll see in the

17   complaint is, and they obviously, they pled the first

18   complaint, they pled the first complaint, we filed a

19   motion to dismiss, and rather than responding to that,

20   they amended their complaint.  And what you'll see, if you

21   look at the differences, is in order to basically plug the

22   hole that they have in their own pleading, they try to

23   come up with evidence against Mr. Luth.

24         And what they pled, what you'll see are what

25   they call improper corporate activities, and what I would

1    submit is, one, when you read them, you'll see that the

2    allegations are, some of them are completely ambiguous,

3    some do not show any sort of impropriety on Mr. Luth's

4    part, but most importantly, those are actions that are

5    absolutely -- they are events that are absolutely

6    collateral to the alleged scheme.  There's no allegations

7    or pleading to show how these corporate activities have

8    anything to do with the overall scheme.

9         For example, one allegation is that Mr. Luth

10   passed on an early redemption request.  The governing

11   documents allow, give the managers firm discretion to

12   allow early redemptions, but there's absolutely -- in any

13   event, there's absolutely no allegation that Mr. Luth was

14   the person who approved the redemption request or that he

15   carried out the redemption request.  All he did was pass

16   onto his partners a redemption request.

17        So, I think you'll see when you read it with a

18   critical eye they are simply reaching to find something to

19   try to hold the case together.  If they want to pursue a,

20   if they want to pursue a breach of fiduciary duty case,

21   Your Honor, that's Mr. Luth, on these collateral, you

22   know, what they call improper corporate activities, then

23   they should plead the complaint that way.  And what --

24   there's been -- I think what is now finally clear, and

25   it's taken a while, is, you know, when we receive the

1     complaint, the question was are they going to acknowledge

2     that he wasn't a participant in this scheme.  Ultimately

3     there was a hearing in front of Judge Arterton where

4     Mr. Illarramendi testified and he said he did not tell

5     Mr. Luth, and that's attached to our papers, Your Honor.

6     We believe Your Honor can consider that.

7          And ultimately in the reply brief, they said

8     we're not alleging that he was a coconspirator, so I think

9     that's off the table.  So we do have a real live situation

10    where somebody had the misfortune of working for six years

11    in the same firm with somebody who has now turned out to

12    be a fraudster who was hiding it from the auditors, hiding

13    it to globe out the administrator.

14         So I believe the Receiver should be, given the

15    access to information they've had, held to a high standard

16    in coming forward with factual, specific factual

17    allegations that would justify such a broad and sweeping

18    case against Mr. Luth.

19         And, finally, Your Honor, a Ponzi presumption,

20    since you asked a question of Mr. Raabe about that, just

21    so we're clear, the complaint does not plead -- they make

22    one reference about Mr. Illarramendi saying that money

23    from new investors was used to help pay off old investors

24    but that's it.  There's no, there's no allegations as to

25    when that occurred, how often the complaint itself

1    acknowledges, acknowledges that High View Point Partners

2    did engage in legitimate activities that would been -- you

3    know, that were done for a profit.  Some transactions

4    earned a profit.  Most importantly, they don't plead that

5    the payments to Mr. Luth, that the payments to Mr. Luth

6    came from money from new investors.  There's no connection

7    made.

8            And, most importantly, on the law, Your Honor,

9    we cite cases that show for the Ponzi presumption to

10   apply, there's numerous factors that the Court has to

11   take -- factors that the Court has to take into

12   consideration before deciding whether it's appropriate to

13   grant them this sweeping presumption that would relieve

14   them of some of their pleading burden.

15           And we cite cases, some cases where courts have

16   found that, yes, there was a Ponzi scheme, Ponzi scheme

17   going on, but you haven't come forward with facts or

18   allegations that would tie these payments to the Ponzi

19   scheme.  Or they've said, yes, there were Ponzi-like

20   qualities to the scheme but there were legitimate

21   activities going on at the same firm, therefore, we're not

22   going to apply the Ponzi presumption for that reason.

23           So, unless the Court has any questions -- thank

24   you.

25           THE COURT:  Thank you.

1            MR. MURPHY:  Good afternoon, Your Honor.

2            THE COURT:  Good afternoon.

3            MR. MURPHY:  Tom Murphy on behalf of Victor

4     Chong.  And I guess first, Your Honor, the first thing I'd

5     like to do is adopt the arguments of counsel for Mr. Lopez

6     and for Mr. Luth.

7            And, in particular, to pick up on the points

8     that Mr. Pavlis was making just now about these are very

9     serious allegations in this complaint, if Your Honor has

10    read the complaint or reads the first amended complaint,

11    or reads it again, what you'll see is that the allegations

12    against my client, Victor Chong, are quite serious, stated

13    in somewhat hyperbolic terms at times -- terms that aren't

14    justified in light of the facts that are pleaded.  And,

15    Your Honor, that's what we're looking for here, is that

16    the Court review this complaint with the context of

17    knowing the other things that the Receiver has alleged.

18           As Mr. Pavlis pointed out, the Receiver doesn't

19    claim that these defendants, certainly that Mr. Chong,

20    actually knew about Mr. Illarramendi's wrongdoing.

21    There's no suggestion that he actually knew in the

22    complaint.

23           The Receiver concedes that he's not claiming

24    that Victor Chong was a coconspirator, and the Receiver

25    admits that Mr. Illarramendi agreed to hide his fraudulent

1    scheme from others.  And that, Your Honor, I suggest is

2    the most critical thing for the Court to keep in mind as

3    it looks at this complaint.  If you're looking at whether

4    these individuals committed the kind of acts that the

5    Receiver has alleged, how is that consistent, how is that

6    plausible in light of a claim Mr. Illarramendi actively

7    concealed his fraud?

8         And I think, Your Honor, if you add a layer of

9    context on top of that about my client particularly, Mr.

10   Chong, the compliant reveals the following things:

11   Mr. Chong was at all times an employee of High View Point

12   Partners.  He was never a member of the LLC.  Mr. Chong

13   was employed at High View Point Partners for nearly six

14   years.  High View Point Partners was a five person

15   organization.  It was not General Electric, as Your Honor

16   referenced in the last argument.

17        And that's all important, Your Honor, because

18   the 35 million-dollars that the Receiver wants to recover

19   from these High View Point defendants, that

20   35 million-dollars consists of approximately

21   1.2 million-dollars that went to Mr. Chong over a nearly

22   six year period.  That relates to 3.5 percent of the

23   35 million-dollars.  It's 220,000-dollars a year on

24   average.  I'm sure Your Honor's dealt with a lot of hedge

25   fundal litigation in this part of the state.

1     220,000-dollars in that time frame, 2005 to 2011, is not

2     unreasonable compensation for somebody who's an employee

3     of a hedge fund.

4              And that's important because there is no claim

5     in this complaint that Mr. Chong received compensation

6     that was unreasonable under the circumstances.  And as

7     Mr. Pavlis pointed out, the Receiver goes so far, without

8     explanation, as to seek to recover Mr. Chong's salary

9     before the hole was created and after Mr. Illarramendi

10    left, without any explanation for why they would be

11    entitled to do that either.

12             Just by way of one example, Your Honor, of the

13    kind of things that are particularly problematic when it

14    comes to Mr. Chong's circumstance, because, as I said

15    before, these are conclusory allegations.  They are

16    pleaded without fact.  Even those things that have been

17    added to the amended complaint after our last motion to

18    dismiss are stated in a purely conclusory fashion.  We'd

19    ask the Court to take a look and see.

20             But one of them is a claim that Mr. Chong turned

21    a blind eye to Mr. Illarramendi paying, quote, "expensive

22    bribes to a Venezuelan official."  Now, obviously that's a

23    very serious allegation, highly damaging to Mr. Chong, who

24    is currently unemployed after this has happened.  And it's

25    not supported by any facts.  Doesn't identify the

```
1    official, does not identify the amount of money paid,
2    doesn't identify anything about that bribe and certainly
3    doesn't identify anything that justifies being able to say
4    that Mr. Chong turned a blind eye.  And, Your Honor, our
5    position is that type of pleading is inadequate, that type
6    of pleading does not meet the standards of Iqbal and
7    Twombly.
8              One other large example, Your Honor, and then
9    I'll move on, unless the Court has any questions, and rest
10   on our briefs.  It relates to the fraudulent transfer
11   claims.  The way they are currently pleaded, the Receiver
12   essentially claims that the creditors, for purposes of
13   fraudulent transfer claims, are all of the receivership
14   entities.  There is no detail.
15             Connecticut's own Uniform Fraudulent Transfer
16   Act requires pleading a creditor with a prior obligation.
17   It's not done in this complaint.  We don't know which of
18   the 20-plus receivership entities, we don't know how much
19   money.
20             So, Your Honor, our view is that that clearly is
21   improper and doesn't meet the standard of Iqbal, Twombly
22   or Rule 9(b).  So unless the Court has any further
23   questions.  Thank you.
24             THE COURT:  That's fine.  Thank you.
25             I do have one maybe general question for the
```

defense side, and that is in terms of the statute of
limitations, a motion to dismiss addressed in the statute
of limitations, it seems to me, is successful when the
entire claim is barred by the statute of limitations.  But
if, if the statute of limitation acts merely as a limit on
damages or a limit on the period over which damages could
be sought, then I think that's a jury charge issue.  Does
anybody want to be heard on that?

         In other words, I don't understand that I should
be dismissing a claim to the extent that it seeks damages
earlier than X date.

         MR. RAABE:  Yes, Your Honor.  It may be a
summary judgment issue, not a jury issue.  But for
Mr. Lopez, we agree.

         MR. PAVLIS:  Your Honor, I think page 24 and 25
of our opening brief, we cite some cases for the
proposition that you can dismiss portions on a motion, to
dismiss portions of the count.

         THE COURT:  Well, I would agree with that as a
general matter.  In other words, sometimes a count has got
four or five causes of action in it and I think you can
dismiss a part of a count, but what's being sought here is
basically dismissing a claim to the extent that it seeks
damages prior to a certain date.  It just doesn't seem
like a motion to dismiss issue to me, frankly.

1          MR. PAVLIS:  We cite the cases, Your Honor, we

2     don't really discuss them, given the limitations of the

3     pages, but I believe they stand for the proposition that

4     in a case like this where they've set forth a schedule,

5     they've attached a schedule of payment -- of, you know, of

6     alleged conveyances or transfers, that they are seeking to

7     recover, in a case like this where they can easily be

8     segregated in terms of what's barred and what's not barred

9     by the statute of limitations, that the Court would have

10    authority to grant the motion to dismiss to that extent.

11    We would be happy to submit a supplemental letter or

12    brief.

13          THE COURT:  So, you're suggesting that the claim

14    be dismissed to the extent it's based on transaction one,

15    two or three.

16          MR. PAVLIS:  Yes, transfers prior to that date.

17          THE COURT:  Transfers.

18          MR. PAVLIS:  Because it's really about

19    transfers, whether they are salaries or bonuses, and they

20    are listed by date in the exhibits in the complaint.

21          THE COURT:  Okay, fine.  Thank you.

22          MR. NEW:  Your Honor, I'll endeavor to be brief.

23    I know it's getting late in the day.

24          I think it would be helpful first to sort of put

25    into context exactly what is in the Receiver's complaint,

1    what the claims are.  And then once, once that is clear, I

2    think it becomes clearer exactly why those claims are

3    sufficient to withstand this motion to dismiss, and have

4    set forth all the allegations sufficiently with regard to

5    each of the claims set forth by the Receiver.

6           As Your Honor is aware, Mr. Illarramendi has

7    pled guilty to a massive fraud that spanned multiple

8    years, involved multiple entities.  As the Receiver has

9    alleged, it started at the High View Point Partners in

10   2005, and then proceeded onto another group of entities,

11   to the Michael Kenway (ph) entities which then, was found

12   to continue and further the fraud later.  And as the

13   Receiver alleges, there are a lot of interrelated

14   transactions between and among all the different entities

15   here.

16          Mr. Illarramendi has pled guilty to a number of

17   securities fraud issues, and in the course of that guilty

18   plea, the offense conduct, stipulated offense conduct that

19   he agreed to in the course of his guilty plea,

20   specifically said he was using old investor money -- I'm

21   sorry, new investor money to pay old investors.

22          Your Honor, the case law is actually clear, as

23   Your Honor sets forth, that a Ponzi scheme does not have

24   to be a classic Ponzi scheme in the sense that Mr. Ponzi

25   invented it.  There are many different flavors and many

1    different ways that Ponzi schemes have been created, and

2    we cite to certain cases in our brief.  The main case we

3    cite to is the Second Circuit case, Hersh v. Arthur

4    Anderson, where the standard or the description that the

5    Second Circuit uses is "A company that operates and

6    continues to operate at a loss.  The company gives the

7    appearance of being profitable by obtaining new investors

8    and using those investments to pay for the premiums

9    promised to earlier investors, the result of which is to

10   put it farther and farther into debt."

11          And there's other case law.  I would refer Your

12   Honor to the In Re: Manhattan Investment Fund case, and In

13   Re: Nevergence, Inc. (ph), which is 405 ER 709, where they

14   quite clearly say that the case law, quote, "The case law

15   has revealed that a clever device based on a Ponzi concept

16   will not remove a fraudulent scheme from a definition of a

17   Ponzi."

18          And there are numerous examples, including the

19   case of Armstrong v. Collins we cite, where there are

20   legitimate investments in the course of a Ponzi scheme,

21   but that doesn't change the fact that it is a Ponzi and

22   that, for fraudulent conveyance actions in particular, the

23   Ponzi presumption applies.

24          Now, what exactly were the defendants' role here

25   and what are we alleging?  The defendants, Mr. Chong,

1    Mr. Luth and Mr. Lopez were all fiduciaries of High View

2    Point Partners along with Mr. Illarramendi.  Mr. Luth and

3    Mr. Lopez were managing members.  They were owners of High

4    View Point Partners.  Mr. Chong was an employee, but he

5    had two positions there.  He was the chief appliance

6    officer since at least 2006, and he was the chief

7    financial officer, we allege, since August of 2005.

8            And in those roles, they assumed various

9    fiduciary duties to the entities.  We allege they breached

10   those fiduciary duties.  We've also alleged that they

11   received numerous fraudulent transfers as a result of this

12   Ponzi scheme.

13           To be clear, we have not alleged that they aided

14   and abetted the fraud, so we do not have to meet a

15   pleading standard that would be required for aiding and

16   abetting fraud.  We only have to meet the Rule 8 notice

17   pleading standard, Your Honor, as interpreted by Iqbal and

18   Twombly.

19           With the one exception, that to the extent we

20   have alleged they received actually fraudulent transfers,

21   that is, under the -- either under CUFTA, the actual

22   fraudulent transfer prong, or under the common law, act of

23   fraudulent transfer prong, we would need to plead

24   sufficient facts to show that those transfers were made by

25   the transferor, Mr. Illarramendi, with fraudulent intent.

1          The Ponzi presumption would apply in that

2     situation and say, well, because we've sufficiently

3     alleged the Ponzi scheme, because in fact he's pled guilty

4     to all of the elements of a Ponzi scheme, even if for

5     whatever reasonable he refuses to use that word, that the

6     presumption applies that he admitted those transfers with

7     fraudulent intent.

8          But separate and apart from that, we have a rare

9     case here, Your Honor.  Maybe not so rare these days, but

10    a rare case where the transferor has pled guilty to

11    committing fraud.  And whether you describe that fraud as

12    a Ponzi scheme or you describe it some other way, the fact

13    is that he created this hole, that he engaged in numerous

14    fraudulent transactions in order to conceal it and to try

15    to further the scheme to keep it alive, and in the course

16    of that, he dug himself a bigger hole.

17         We have alleged that these defendants took

18    actions throughout that period that allowed him to do

19    that, that allowed him to further the Ponzi scheme.  And,

20    in fact, they knew that he was doing things that were

21    fraudulent and illegal.  They may not have known it was a

22    Ponzi scheme but they knew he was engaging in fraudulent

23    acts.  And all of that, Your Honor, goes to the specific

24    factual element to each one.

25         I think it's important in order to consider the

1   fact that Mr. Lopez is not contesting that we have alleged

2   that in October -- in the Summer of 2006, he was told

3   there was a hole.  And we've also alleged that he told

4   Mr. Illarramendi, don't tell the moment the investors.

5   Cover that up and try and fix it.  So, right there, Your

6   Honor, he is knowingly participating in a fraud, and the

7   fact that this continued on for multiple years after that

8   doesn't change the fact he had that knowledge back in

9   2006.

10          THE COURT:  Well, he was told about a fraud.

11   Where do you allege that he participated in that fraud?

12          MR. NEW:  Your Honor, we allege that he told

13   Mr. Illarramendi that he could not -- I don't have it in

14   front of me, Your Honor -- that he could not tell the

15   investors about that, that he needed to fix it, that there

16   was a hole and he needed to fix it.

17          And if you look at the rest of the conduct, Your

18   Honor, look at what we have described in a series of

19   detailed transactions is the fact that he received over

20   the course of this Ponzi scheme, 12 million dollars in

21   transfers out of total of 15 million that are not related

22   to salary or bonus or any other, what they would consider

23   to be an ordinary course payment.  12 million out of 15

24   went to things like paying for his private airplane, that

25   he personally looted these entities, just as Illarramendi

1    did.

2            We've alleged that in 2010, 5.3 million-dollars

3    went to a company called Flight Services and another

4    2 million went to another company that Mr. Illarramendi

5    controlled, all for purposes of paying for that airplane.

6    We've alleged that he received other transactions over and

7    over again.

8            And, in fact, if you look at all of the

9    defendants, Your Honor, and all of the totality of the

10   transfers here, out of 35 million-dollars in transactions,

11   about 28 million, if my math is correct, relate to

12   non-salary, non-bonus, non-partnership distributions.

13   They were taking money over and over and over again from

14   this entity for their own personal use.

15           As a clear breach of fiduciary duty, that is

16   self dealing, and we would posit, Your Honor, they were

17   paid that money by Illarramendi knowingly so that they

18   would continue to look the other way, so this fraud would

19   continue, that they would assist him when he needed them

20   to cover up for things.

21           With regard to specific acts taken by Mr. Luth,

22   I think it's instructive in terms of the role that he

23   played here, we've alleged, for example, that in July of

24   2009, there was money that was placed in an account that

25   Mr. Illarramendi has referred to as the commingling

1    account.  That's the account at BCT Bank, which was a bank

2    that Mr. Lopez was the director of.  And what we've

3    alleged is that Mr. Luth, all the defendants knew about

4    that account.  He was aware that money had been placed in

5    that account, and he lied to the fund administrator to

6    cover up for where that money went.  He told the fund

7    administrator that that money was going to be used for a

8    legitimate trade, to book a trade, and in fact it wasn't.

9    All right.

10         That money went to, was commingled with the

11   money from the Michael Kenway Group.  And that's important

12   for a number of reasons.  It shows that Mr. Luth knew what

13   Mr. Illarramendi was doing.  It wasn't just in a silo.  He

14   wasn't just off doing trade as part of his portfolio.  He

15   knew that Mr. Illarramendi was engaged in transactions and

16   that those transactions included commingling and

17   self-dealing between the Mike Kenway Group and the High

18   View Point Group.

19         He also covered up for him.  He lied to the fund

20   administrator about where that money went.  That's just

21   one example, Your Honor.  We have other examples,

22   including the investment in 2009 in which he helped

23   Mr. Illarramendi move something off the books and entered

24   into reinvestment so that they could conceal it from the

25   year end audit of the auditors.

1          We also allege that he manipulated the

2    valuations of different fictitious transactions in order

3    to make it seem like it was profitable.

4          Mr. Chong was a chief appliance officer.  He was

5    also chief financial officer.  He was supposed to be

6    making sure that the company was on the level and wasn't

7    engaging in fraudulent transactions.  He had access to all

8    the bank accounts, and in fact he would often be the one

9    making the transfers in the bank accounts.

10          So, when Mr. Illarramendi is paying bribes to

11   foreign officials, Mr. Chong is not monitoring.  He

12   doesn't stop him.  He doesn't ask him questions about

13   what's going on.  He is the chief financial officer.  He's

14   the chief compliance officer.  He's not doing anything.

15   This is going on over and over and over again.

16          Your Honor just heard arguments with regard to

17   Mr. Beracha that sets forth a lot of bribes.  Some of

18   those are repeated in this case.  It's very clear.

19          And so, from the Receiver's point of view, you

20   have basically two sets of allegations here -- say three

21   sets of allegations.  You have the fraudulent transfers

22   for which what the Receiver has to allege is that there

23   was either an actual or constructive fraudulent transfer.

24          Constructive fraud, Your Honor, we've alleged

25   that these entities were insolvent.  We've alleged there

1    wasn't reasonably put a value given to them.  We've

2    identified specifically the transfers that to this date we

3    knew about; where the money came from, where it went.

4         To the extent that there was a creditor, the

5    receivership entities are creditors in this case, as --

6    following the logic of the Shoal (ph) case which hasn't

7    been discussed today but I think in our briefs, it's set

8    forth.  So, the receivership entities are creditors

9    because they have been harmed by Mr. Illarramendi's

10   conduct.  And, as tort creditors, they have standing under

11   CUFTA and under the common law to bring back these claims.

12        In addition, because of the way he commingled

13   the funds amongst each of the entities, they each became

14   creditors of each other and so, therefore, we have

15   sufficiently alleged at this stage that they are creditors

16   under CUFTA and the common law in order to bring about

17   those fraudulent transfers.

18        We also allege breach of fiduciary duty claims

19   against each of these defendants.  And I don't want to

20   misinterpret what Mr. Pavlis said, but it sounded almost

21   as if he conceded there was a breach of fiduciary duty

22   case here.  And we would agree.  We believe we have set

23   forth against each of the defendants that they had, they

24   were in positions where they had fiduciary duties and

25   obligations to High View Point Partners, and also the High

 1      View Points funds, which although we do not have standing

 2      currently to represent, we anticipate that very soon, if

 3      Judge Arterton rules in our favor on settlement, which is

 4      on consent, we will have standing to represent those

 5      entities as well.  But they have fiduciary duties clearly

 6      with High View Point Partners and we allege they breached

 7      that in numerous way.

 8              Then there are common law things, Your Honor,

 9      which there hasn't been much discussion of today, but

10      we've alleged unjust enrichment, conversion, accounting,

11      and constructive trust.  All of them are multiple bases on

12      which to proceed against each of the defendants.

13              Before I sit down, I just want to address one

14      other issue, Your Honor, that Mr. Pavlis raised today, and

15      that's the concept that somehow there should be some sort

16      of heightened standard on pleading for a receiver who has

17      been appointed over a group of entities.

18              Respectfully, Your Honor, I think Mr. Pavlis has

19      it backwards.  The case law is quite clear, particularly

20      in the bankruptcy context but also in the context of other

21      types of trustees and receivers, that when you have an

22      incredibly complex fraud and a receiver is put in place to

23      try to sort out what went on, given that the receiver was

24      not the actor that was there at the time, given that you

25      have a scenario, as here, where you have extensive

1    commingling of funds among entities over multiple years,

2    virtually no books or records to speak of, and the books

3    and records that do exist are books and records that are

4    fraudulent, and you have individuals who worked for those

5    entities, like the defendants, who when asked to provide

6    information to the receiver, or to be deposed, assert

7    their Fifth Amendment right not to testify, which they can

8    do, but with that comes an inference that there's a reason

9    they are asserting their rights and it makes the

10   receiver's life much more difficult.

11        So, for Mr. Pavlis to stand up here and say that

12   somehow the Receiver should be held to a higher standard

13   really reverses the situation, Your Honor.  The Receiver

14   has put together within the statute of limitations to the

15   best of his knowledge the facts that he has become aware

16   of.  They are sufficient to allow this case to proceed and

17   in the course of discovery undoubtedly more will come out,

18   more details, more facts, but we have sufficiently pled

19   enough to advance this case.

20        Unless the Court has any questions --

21        THE COURT:  Well, I just have really one minor

22   question for you, and that is aren't constructive trust in

23   accounting remedies rather than causes of action?

24        MR. NEW:  Your Honor, there is clearly a split

25   of authority in Connecticut.  We've acknowledged that in

1    our briefs.  We are aware of the fact that in the McCumber

2    (ph) case, the Supreme Court of Connecticut has seen in a

3    footnote that they are remedies and they are not causes of

4    action.  Nevertheless, there are lower court cases in the

5    State of Connecticut, before and after McCumber, that

6    continue to recognize it as a cause of action.

7             I think the argument is probably, to be honest

8    with Your Honor, the argument is a better argument for

9    constructive trust than it is for accounting.

10   Constructive trust is usually thought of hand in hand with

11   unjust enrichment.  Accounting, if it's necessary, it's

12   necessary, Your Honor.

13            It's in a situation like this where there's

14   fraud, where there's some sort inability to adjust the

15   accounts between parties, where it's necessary.  And so it

16   seems particularly apt as a cause, an equitable cause of

17   action, as far as I can see.

18            But, you know, if Your Honor is inclined to rule

19   with the cases that hold that they are both remedies and

20   not causes of action, nevertheless, as we've asked, we

21   should be allowed to proceed on them in this case as

22   remedies, as requests for relief, and they shouldn't be

23   just entirely stricken from the complaint.

24

25            THE COURT:  All right, thank you.

1          MR. RAABE:  Two issues, Judge?

2          THE COURT:  Times three?  Quickly, because I

3    have another matter that started at 3:00 o'clock.

4          MR. RAABE:  First, Your Honor, with regard to

5    the Ponzi scheme and putting bad money after worse money,

6    if you look at paragraph 89 and 90 of the complaint, it

7    talks about Mr. Illarramendi engaging in Bermuda trades.

8    Not taking bad money to throw after worse money, but

9    engaging in trades and trades that were not very

10   profitable.

11         And then that's the paragraph where they say

12   that Mr. Lopez is encouraging the fraud without any

13   factual support for that.

14         Similar to the point my colleagues raised, the

15   schemes supposedly commences in October of 2005.  So, what

16   we have just heard the Receiver say is all of these

17   transactions are fraudulent, all of this commingling makes

18   everything related to everything else, and therefore, we

19   can pull it all back.

20         In Exhibit A, the first page under Other with

21   regard to Mr. Lopez, they are trying to get 45,000-dollars

22   back from Argenta Management (ph) for a transaction on

23   September 27th, 2005, before there was any hole, before

24   there was any fraud.  It's emblematic of the problem with

25   these sweeping allegations.

1          THE COURT:  Okay, thank you.

2          MR. PAVLIS:  Just very briefly, Your Honor, I

3    think Mr. New said that Mr. Luth, Mr. Lopez and Mr. Chong

4    engaged in acts that allowed Mr. Illarramendi to further

5    the scheme and they knew he was engaging in fraudulent

6    acts.  I'm at loss to see any allegations in the

7    complaint, factual, specific factual allegations that give

8    rise to a strong inference that Mr. Luth had that

9    knowledge.  Your Honor can read the complaint but I think

10   you'll see that.

11          In addition, these discrete sort of corporate

12   activities that the Receiver's attempting to build their

13   case on, we would just ask the Court, when you look at

14   those, I think you'll see that either one, they pick out

15   two emails a year apart that on their face is ambiguous,

16   and try to leap to the conclusion that Mr. Luth was

17   rendering false valuations.

18          There's no facts pled that would give rise to an

19   inference that he knew that the valuations were false.  In

20   addition, the fact that he knew about the BCT account,

21   there's nothing in the email, the two emails that are

22   cited in that paragraph that give rise to a strong

23   inference that he knew he was passing on lies to globe

24   out.  The emails themselves show the globe out.  They

25   disclose the existence of the globe out, so tell they knew

1      of the existence of the CBT account.  So the complaint

2      really just leaves more questions than it answers.

3              Finally, Your Honor, we're obviously, we're not

4      conceding there's a breach of fiduciary duty claim here.

5      My only point was if they want to pursue what I would

6      call, you know, alleged foot faults related to collateral

7      corporate acts, then the case should be pled that way and

8      we'll deal with it in the normal course.  But we don't see

9      any facts that give rise to a fraudulent conveyance claim

10     that seeks to recoup every single dollar in there.  Thank

11     you.

12              THE COURT:  Thank you.

13              MR. MURPHY:  Real briefly, Your Honor.

14              The first thing, Your Honor, I wanted to mention

15     is Mr. New recounting the discussion that Mr. Lopez and

16     Mr. Illarramendi are alleged to have had about who should

17     or shouldn't be told about the hole.  He said that they --

18     -- they, the Receiver -- have alleged don't tell the

19     investors.

20              Your Honor, in paragraph 52 of the complaint,

21     what's really alleged that is Lopez told Illarramendi to

22     fix the situation and the two agreed not to inform

23     investors or anyone else about the existence of the

24     fraudulent scheme.

25              And I raise that, Your Honor, because it's

1    particularly important for my client.  It's the context I

2    asked Your Honor to look at the complaint with, because

3    you can't have -- you can't accept some of the undescribed

4    allegations that they make while also accepting that

5    Mr. Illarramendi is actively concealing what he's doing

6    from my client.

7          One other thing very briefly, Your Honor -- or

8    two, I guess.  One is I mentioned earlier the unadorned

9    allegation that my client turned a blind eye to bribes

10   being paid to Venezuelan officials, and that was mentioned

11   just now, and Mr. New referenced having raised something

12   about that in the Beracha case earlier.  And as I was

13   sitting here in the back, just before we came up, when

14   that came up, I looked at the Beracha complaint, and if

15   Your Honor does the same and compares the allegations of

16   bribery or bribery related conduct with the Beracha case

17   with what is stated about Mr. Chong, I think you'll see a

18   stark example of the deficiency where there isn't anything

19   in the complaint about Mr. Chong.

20         And, finally, I probably don't need to say this

21   to Your Honor, but the reason our clients took the Fifth

22   Amendment is there is an active criminal investigation and

23   we have the right in ambiguous circumstances to do that.

24   And this is not a circumstance where any inference should

25   reasonably be drawn from it, because the kind of

1    allegations loosely made by the Receiver are exactly what
2    we have to protect against in the criminal case.  Thank
3    you.
4              THE COURT:  Okay.  Thank you all.  I will take
5    up the issues and issue something in writing as soon as I
6    can.  Appreciate it.
7              Have a great Thanksgiving.
8              Stand in recess.
9              (Whereupon the above matter was adjourned at 3:50
10   o'clock, p. m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.




        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917) 703-0761