**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN J. CARNEY, in his capacity as COURT-APPOINTED RECEIVER for HIGHVIEW POINT PARTNERS, LLC, et al., | | |
| Plaintiff, | | No. 3:12-cv-00182 (SRU) |
| v. | | |
| FRANK LOPEZ, et al., Defendants. | | |

## RULING ON MOTIONS TO DISMISS AND TO STRIKE

This case is ancillary to a U.S. Securities and Exchange Commission ("SEC")

enforcement proceeding against Francisco Illarramendi ("Illarramendi") for violation of federal

securities laws.  The United States District Court for the District of Connecticut created a

receivership estate and appointed John J. Carney (the "Receiver") as receiver.  The Receiver

subsequently filed a complaint against Frank Lopez ("Lopez"), Christopher Luth ("Luth"),

Victor Chong ("Chong"), Carolina Lopez Peláez ("Peláez"), and Carlos Manuel Barrantes Araya

("Barrantes") to recover proceeds and other monies for distribution to Illarramendi's alleged

victims and creditors.  Defendants move to dismiss the complaint, alleging that the court lacks

personal jurisdiction and contesting the sufficiency of the pleadings and the claims asserted

therein.  Defendants have also moved to strike portions of the Receiver's complaint.

For the reasons stated below, I grant in part and deny in part the following motions:  doc.

69 (Peláez and Barrantes' motion to dismiss), doc. 71 (Lopez's motion to dismiss and motion to

strike), doc. 72 (Chong's motion to dismiss), doc. 73 (Luth's motion to dismiss and motion to

strike).

I.       **Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.    Background[1]

This action is an effort to recover approximately $35.5 million that Illarramendi diverted to the defendants in order to sustain his Ponzi scheme. The Receiver alleges that Lopez, Luth, and Chong (the "HVP Defendants"), fiduciaries of Highview Point Partners, LLP ("HVP Partners"), an entity subject to the present receivership,[2] helped to conceal the scheme or ignored conduct that would have ended the scheme.  In return, the defendants received transfers that were made to them under a variety of guises, including salaries, "bonus" payments, and investments in entities they controlled.  The Receiver is also seeking to recover funds transferred to Lopez's sister, Peláez, and her husband, Barrantes.

### A.  The Defendants

HVP Partners was, at most, a five-person operation, made up of: Illarramendi, Lopez, and Luth, who were founders, principals, and managing members of HVP Partners; Chong, HVP Partners' Chief Financial and Chief Compliance Officer; and another employee.[3]  Lopez was also a director of three funds managed by HVP Partners (the "HVP Funds").  The HVP Defendants, through their positions at HVP Partners, controlled the HVP Funds.  As a result, the HVP Defendants had a clear view of the flow of money among the receivership entities, other third party individuals and entities, and in some cases, facilitated these transactions.  Lopez,

---

[1] All background information is taken from the First Amended Complaint, unless otherwise noted, and is presumed to be true for purposes of the present motions.

[2] The receivership entities include: HVP Partners; MK Master Investments LP; MK Investments, Ltd.; MK Oil Ventures LLC; the MK Group; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MK Capital Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd.; and Short Term Liquidity Fund, I, Ltd.

[3] Neither Peláez nor Barrantes were employees of HVP Partners.

Luth, and Chong have invoked the Fifth Amendment and refused to cooperate in the Receiver's investigation.

### 1. *Lopez*

Lopez was a resident of New York at all times relevant to this complaint and owns a residence in Florida. Prior to working at HVP Partners, Lopez worked at an investment bank for almost twenty years where, at various times, he was a supervisor of Illarramendi. Illarramendi has testified that, in or about the summer of 2006, he revealed the fraud's existence to Lopez. Rather than disclosing the fraud, Lopez conspired to conceal it, telling Illarramendi to "fix the situation" and agreeing with him not to inform investors or anyone else.

### 2. *Luth*

Luth is a resident of Connecticut.  Prior to forming HVP Partners with Lopez and Illarramendi, he held senior positions at major financial institutions. In addition to his role as a founding member and principal, Luth served as a portfolio manager and "Head Trader" at HVP Partners, positions in which he was responsible for analyzing and making investments and given access to the financial information of HVP Partners and the HVP Funds.

### 3. *Chong*

Chong is a resident of New York.  Before joining HVP Partners, he worked at an independent investment bank that served Latin American clients.  He also worked with Illarramendi at the U.S. affiliate of Venezuela's state-owned oil company.  As Chief Financial Officer and Chief Compliance Officer of HVP Partners, Chong was responsible for ensuring that HVP Partners' compliance with regulatory requirements and had access to all of the financial information of HVP Partners and the funds they controlled.

### 4. *Peláez and Barrantes*

Peláez and Barrantes are residents of Costa Rica.  Receivership entities transferred assets to a joint bank account they hold in Florida and to a New York account Peláez holds in her own name.  Peláez is also a control person of Underhill Investments, a Panamanian corporation that served as an intermediary in various transactions with receivership entities.

B.  The Scheme

In October 2005, with the complicity of the HVP Defendants, Illarramendi embarked on an elaborate scheme to hide the "hole" between the real assets held by the funds containing the investors' monies entrusted to HVP Partners and the liabilities owed as a result of trading losses and the efforts to conceal those losses.  The scheme involved the use of offshore entities and bank accounts and a complex web of transfers, loans and transactions with numerous persons and entities that were often poorly or falsely documented on the books and records of HVP Partners and related hedge funds.  When the entire scheme was revealed, the "hole" amounted to more than $300 million.

Luth, Lopez, and Illarramendi formed HVP Partners in 2004, each holding a one-third ownership share.  The purpose of HVP Partners was to act as the investment manager of the Offshore Fund, a hedge fund to be nominally based in the Cayman Islands (which, the Receiver alleges was actually completely dominated and controlled by HVP Partners, with Lopez as one of its directors).  By January 2006, HVP Partners controlled over $72 million of assets in the Offshore Fund and decided to establish a "master-feeder" structure.  To do so, they created the Master Fund, which was incorporated in the Cayman Islands, turned the Offshore Fund into an offshore feeder fund, and created Highview Point L.P., a domestic feeder fund.  Lopez was made a director of the Master Fund and power over the fund was handed to HVP Partners, and thus, the HVP Defendants.

In October 2005, Illarramendi entered into a failed deal that generated substantial losses. Rather than disclose the losses to investors, Illarramendi decided to conceal them. He transferred proceeds received in the transaction to investors other than the Offshore Fund, in amounts greater than the initial investment to make it appear as if those investors had received profits rather than suffer losses. This resulted in a cash shortfall that the Offshore Fund absorbed, which was concealed on the books. The shortfall was approximately $5.2 million, or roughly 10% of the net asset value reported on the Offshore Funds' books. The HVP Defendants failed to oversee Illarramendi's activities, the Offshore investments, or the books and records of the Offshore Fund. Lopez and Peláez received approximately $50,000 in false profits from this transaction.

Illarramendi subsequently directed another entity, GlobeOp, the HVP Funds' administrator, to record entries in the books falsely reflecting that $5.2 million in funds had been transferred to and invested in, Ontime Overseas, Inc. ("Ontime"), another entity. The HVP Defendants failed to supervise Illarramendi here, too. Illarramendi could not cover the $5.2 million hole and directed Ontime to transfer $7.4 million to the Offshore Fund to make it appear that the falsely recorded investment in Ontime was being redeemed.

To fund the transfer to Ontime, Illarramendi transferred $5.5 million from the HVP Partners' Wachovia Bank account. Illarramendi caused HVP Partners to fund these fraudulent transfers primarily through a loan to HVP Partners from a bank where Lopez was a director. Over the next five years, there were a series of additional transactions designed to hide the losses, including transactions involving "off the books" bank accounts and transactions in the "Permuta" market.[4] From 2005 to 2011, the HVP Defendants received at least $35,299,161

---

[4] To conceal the shortfall in assets, Illarramendi engaged in transactions that were not

directly or indirectly in improper transfers.

      C.  <u>Related Proceedings</u>

In March 2011, the United States Attorney for the District of Connecticut filed an information against Illarramendi, alleging that he had engaged in a fraudulent scheme. Illarramendi pled guilty and acknowledged as part of that plea that he had engaged in a scheme to hide from investors and creditors losses he had incurred in a failed transaction and that he had used money provided by new investors to the HVP Funds to pay out returns he promised to early investors. He also admitted to disregarding corporate formalities and commingling investments in various HVP funds. On June 14, 2011, the SEC began a civil enforcement action against Illarramendi and other defendants, alleging that they misappropriated investor assets in violation of the securities laws. The SEC also sought an order freezing the assets of those defendants and the appointment of a Receiver over those assets. In 2011, the Court appointed John J. Carney ("Carney") as Receiver over those assets. This action followed.

**III.**    **Discussion**

The Receiver's complaint contains nine counts: Counts One through Four allege statutory and common law fraudulent transfer claims; Count Five alleges breach of fiduciary duty; Count Six alleges unjust enrichment; Count Seven requests the imposition of a constructive trust with respect to the transfers from Receivership entities to defendants; Count Eight alleges conversion; and Count Nine requests an accounting of transfers from receivership entities. Defendants move to dismiss the complaint in its entirety, arguing that the court lacks personal jurisdiction over

---

recorded in the books and records of HVP Partners, including transactions involving accounts in the names of shell companies. The accounts were under the control of Illarramendi and HVP Partners and contained commingled funds from the receivership entities, HVP Funds, and other third parties. The "Permuta market" or "swap market" was a type of currency exchange market operating in Venezuela that served as an unofficial market in which parties could buy

certain defendants and contesting the sufficiency of the pleadings and the claims asserted therein.

Defendants have also moved to strike portions of the Receiver's complaint.

    A.  <u>Whether this Court Can Exercise Personal Jurisdiction over Peláez and Barrantes</u>

A plaintiff bears the burden of showing that the court has personal jurisdiction over each defendant.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). Where, as here, there has been no discovery on jurisdictional issues and the court is relying solely on the parties' pleadings and affidavits, the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).  The court may consider affidavits and other evidence submitted by the parties.  *Ensign-Bickford Co. v. ICI Explosives USA Inc.*, 817 F. Supp. 1018, 1026 (D. Conn. 1993).  In resolving the personal jurisdiction issue, a court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in his favor."  *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

Peláez and Barrantes argue that the Receiver has failed to make a prima facie showing that this court has personal jurisdiction over them.  The Receiver contends that this court has personal jurisdiction by operation of the federal receivership statute, which provides that:

> A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

> He shall have capacity to sue in any district without ancillary appointment, and may be sued with respect thereto as provided in section 959 of this title.

> Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for

---

Venezuelan government bonds in Bolivars and sell them for U.S. dollars.

each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

28 U.S.C. § 754.  The statute also provides that:

In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts.

*Id.* at § 1692.

Peláez and Barrantes' objection to the federal receivership statute as the basis of personal jurisdiction has two parts.  First, they argue that the statute does not confer personal jurisdiction over them in this court because the Receiver has failed to identify receivership property, or persons alleged to possess that property in the districts where the Receiver has filed the required paperwork.  Second, they argue that the court cannot exercise personal jurisdiction over them as a result of the *in rem* jurisdiction granted by the federal receivership statute.

The first argument is unavailing.  The Receiver has alleged that bank accounts held by Peláez and Barrantes in Florida and New York received transfers from the receivership entities.[5] The second argument fares no better; the circuit courts to address the argument have uniformly rejected it.  *See SEC v. Bilzerian*, 378 F.3d 1100, 1104-05 (D.C. Cir. 2004); *Am. Freedom Train Found. v. Spurney,* 747 F.2d 1069 (1st Cir. 1984); *Haile v. Henderson Nat'l Bank,* 657 F.2d 816, 826 (6th Cir. 1981).  The service of a summons and complaint on Peláez and Barrantes pursuant to Fed. R. Civ. P. 4(k) confers personal jurisdiction over them as long as the Receiver has complied with section 754 by filing the appropriate documents in the judicial districts where receivership property is believed to be located.

---

[5] Peláez and Barrantes jointly hold a bank account at Credit Suisse Bank in Florida and Peláez holds an account in her own name at Wachovia Bank in New York.  Am. Compl. at ¶ 15.

In *Bilzerian*, the D.C. Circuit outlined the "interplay" between Rule 4(k) and 28 U.S.C. sections 754 and 1692.  378 F.3d at 1103-06.  Following the Circuit's reasoning in *Vision Commc'ns*, the court described how establishing personal jurisdiction in a SEC enforcement action is a three-step process. 74 F.3d at 290-91.  "Step one involves [Rule 4(k)(1)(D)], which provides that '[s]ervice of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant . . . when authorized by a statute of the United States."[6]  *Bilzerian*, 378 F.3d at 1103.  Step two requires a statute authorizing service of the defendant outside the relevant court, such as 28 U.S.C. § 1692.  *Id.*  Step three, the invocation of section 1692, requires that a receiver complies with section 754's filing requirements.  *Id.*  Section 754 is "a stepping stone on the court's way to exercising *in personam* jurisdiction." *SEC v. Vision Commc'ns, Inc.*, 74 F.3d 287, 290 (D.C. Cir. 1996).  Thus, service of summons on a defendant in a judicial district establishes the court's jurisdiction pursuant to section 1692 if the Receiver has complied with section 754's filing requirement.  The Receiver effected service on Peláez and Barrantes on March 26, 2012 in Connecticut and acceptance of service was confirmed on March 28, 2012.[7]  I must, therefore, determine if the Receiver has complied with section 754.

The amended complaint states that Peláez, along with her husband, holds a bank account in Florida to which transfers were made from receivership entities, and holds an account in her own name at Wachovia Bank in New York to which transfers were made from receivership entities.  As section 754 requires, the Receiver timely filed copies of the receivership order in the

---

[6] The 2007 Amendment to the Federal Rules of Civil Procedure deleted as redundant former Rule 4(k)(1)(C), which described service on interpleader claimants.  Hence, the former Rule 4(k)(1)(D) addressed in *Bilzerian* is now denoted as Rule 4(k)(1)(C).

[7] Service was effected on Peláez and Barrantes via e-mail to their counsel, Mr. Keefe, in Connecticut.  *Carney v. Lopez, et al.*, 03:12-cv-00182-SRU (doc. 42).

Southern and Eastern Districts of New York, and the Northern, Middle, and Southern Districts of Florida, among other places.  Receiver's Mem. in Opp'n to Mot. to Dismiss ("Rec. Br"). at 18 n.13.

Peláez and Barrantes argue that allegations that they hold bank accounts in Florida or New York to which monies from receivership entities are alleged to have been transferred are insufficient to establish prima facie that receivership assets are located in either place. Specifically, they argue that only one of the alleged transfers to the bank accounts from receivership entities occurred within the applicable statute of limitations.  Defendants cite no case standing for the proposition that a statute of limitations on a receiver's underlying claims bars the court's exercise of personal jurisdiction under the federal receivership statute.  In any event, certain claims the Receiver brings—for example, the unjust enrichment claim and the request for the imposition of a constructive trust—are not subject to a definite statute of a limitations. *See infra*.

Peláez and Barrantes also argue that if the receivership assets alleged by the Receiver to be held in their bank accounts represent challenged salary and bonus payments to Lopez, Luth, or Chong and not assets traceable to the allegedly wrongful transfers to Peláez and Barrantes, then there is no basis for personal jurisdiction over them.  Defendants provide no basis for this contention other than their general opposition to the use of federal receivership statutes to confer personal jurisdiction.  There is no requirement, in order to use the receivership statute to confer personal jurisdiction, that the receivership property be of a certain size or amount or that receivership property held in a person's bank account be traceable to that person in any other way.  The statute requires only that a receiver files the appointment order and complaint in a judicial district where receivership property is located and properly effects service of process on

the defendant.  The Receiver filed the appointment order and complaint in the Florida judicial

district where he alleges receivership property is located, satisfying section 754, and then

invoked section 1692 to serve Peláez and Barrantes in Connecticut, thereby establishing this

court's personal jurisdiction over them.  Accordingly, I deny Peláez and Barrantes' motion to

dismiss for lack of personal jurisdiction.

>    B.    Whether the Receiver's Claims are Subject to Rule 9(b) of the Federal Rules of Civil
>          Procedure

Defendants argue that under Rule 9(b) of the Federal Rules of Civil Procedure, the

Receiver must plead each element of the fraudulent conveyance claims with particularity.[8]  A

fraudulent conveyance plaintiff, however, need only satisfy the particularity requirement with

respect to the requisite mental state, here, actual intent to defraud.  *Cendant Corp. v. Shelton*, 474

F. Supp. 2d 377, 380-81 (D. Conn. 2007) (citing *Nat'l Council on Comp. Ins. v. Caro &*

*Graifman, P.C.*, 259 F. Supp. 2d 172, 179 (D. Conn. 2003)) ("A plaintiff alleging a fraudulent

conveyance is required to plead only the requisite mental state with particularity.")  "Conclusory

allegations of scienter are sufficient if supported by facts giving rise to a strong inference of

fraudulent intent."  *Id.* at 381 (citations omitted; quotations omitted).  Also, "actual fraudulent

intent may be inferred from the circumstances surrounding the transaction . . . ."  *Id.*  Thus, when

reviewing the Receiver's fraudulent conveyance claims, I apply Rule 9(b) only to assess whether

the plaintiff sufficiently alleged that the defendant had fraudulent intent and, in any event, may

---

[8] Defendants also argue that many of the Receiver's allegations are based merely "upon
information and belief" and, thus, are not afforded the assumption of truth with respect to
motions to dismiss fraud claims subject to Rule 9(b).  Luth Mem. in Support of Mot. to Dismiss
and to Strike ("Luth Br.") at 13.  Although it is true that "fraud pleadings generally cannot be
based on information and belief," a plaintiff can base such pleadings on information and belief if
they are "accompanied by a statement of facts upon which belief is founded." *Stern v. Leucadia
Nat. Corp.*, 844 F.2d 997, 1004 (2d Cir. 1998).  In any case, the Receiver's complaint has alleged
sufficient facts to support those actual fraud claims.

infer fraudulent intent from facts supporting the Receiver's allegations.  Rule 9(b) is inapplicable

to claims based on a theory of constructive fraudulent transfer, *see Cendant*, 474 F. Supp. 2d at

380, and, therefore, does not apply to Counts Two and Three of the Receiver's complaint.

A breach of fiduciary duty claim will implicate the heightened pleading standard of Rule

9(b) only if it includes a fraud claim.  *Milo v. Galante*, 2011 WL 1214769, at *9 (D. Conn. Mar.

28, 2011) (citing *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 207, 216-17 (D. Conn. 2007)

(breach of fiduciary duty claim); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 340 (D.

Conn. 2004) (unjust enrichment claim).  Although the Receiver's complaint includes numerous

fraud claims, the breach of fiduciary duty claim is based on the defendants' "misuse of corporate

assets, self-dealing, mismanagement, corporate waste, failure to prepare, implement and carry

out compliance and supervisory responsibilities and policies, failure to heed red flags, and

breaches of their duty to act with care, loyalty, and good faith and fair dealing . . . ."  Am.

Compl. at ¶ 170.  The unjust enrichment count does not include a fraud claim.  Accordingly,

Counts Five and Six of the Receiver's complaint are not subject to Rule 9(b).

## C.   Unclean Hands/*In Pari Delicto*

Defendants assert that the Receiver's complaint should be dismissed because the

Receiver has "unclean hands."  *See* Chong Mem. in Supp. of Mot. to Dismiss ("Chong Br.") at

28-30.  Chong's assertion is essentially an argument for application of the doctrine of *in pari

delicto*.  It is a "basic principle of agency . . . that the acts of a corporation's agents are attributed

to the corporation itself."  *Harp v. King*, 266 Conn. 747, 777-78 (Conn. 2003). The doctrine of *in

pari delicto* provides that actions brought on illegal or corrupt bargains must fail where the

plaintiff has been a significant participant in the subject wrongdoing, bearing at least equal

responsibility for the violations he seeks to redress.  *In re Flanagan*, 415 B.R. 29, 34 (D. Conn.

2009).  Because the complaint alleges that the receivership entities were under Illarramendi's

domination and control, defendants argue, under agency principles, his conduct is properly

imputed to the receivership entities, and the Receiver cannot bring a claim against defendants on

HVP Partners' behalf.

This argument is unpersuasive for at least two reasons.  First, and most importantly,

courts refuse to allow corporate insiders to use the *in pari delicto* defense to bar claims brought

by court-appointed representative of the corporation.  *See, e.g.*, *In re Mediators, Inc.*, 105 F.3d

822, 826-827 (2d Cir. 1997); *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383 (S.D.N.Y. 2011) ("It

bears noting that in pari delicto does not apply to the actions of fiduciaries who are insiders in the

sense that they either are on the board or in management, or in some other way control the

corporation.") (internal quotations, citations, and emphasis omitted). Second, whether the

doctrine of *in pari delicto* applies is a question of fact not appropriately resolved at this stage in

the pleadings.  *See, e.g.*, *Ross v. Bolton*, 904 F.2d 819, 824-25 (2d Cir. 1990); *Global Crossing

Estate Representative v. Winnick*, 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006).

Accordingly, defendants' motions to dismiss the claims on the grounds of *in pari delicto* are

denied.

D.   Counts One and Four: Actual Fraud (Section 52-552e(a)(1)) and Common Law
     Fraudulent Transfer

In Count One, the Receiver brings a claim of fraudulent conveyance based on CUFTA's

provision governing actual fraud, CUFTA Section 52-552e(a)(1), and in Count Four, the

Receiver brings a common law fraudulent transfer claim.  To establish a claim for common law

fraudulent transfer, a plaintiff must demonstrate "*either* (1) that the conveyance was made

without substantial consideration and rendered the transferor unable to meet his obligations; *or*

(2) that the conveyance was made with fraudulent intent in which the grantee participated."

*Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 395 (2008) (quoting

*Bizzoco v. Chinitz*, 193 Conn. 304, 312 (1984) (emphasis added); *see also United States v.*

*Snyder*, 233 F. Supp. 2d 293, 298 (D. Conn. 2002).  A plaintiff need only establish one of the

two alternatives, not both.[9]  *Watson v. Watson*, 221 Conn. 698, 707 (1992).  The Uniform

Fraudulent Transfer Act is "largely an adoption and clarification of the standards of the common

law of [fraudulent conveyances]," thus, I may consider the Receiver's fraud claims under

CUFTA and the common law together.  *Certain Underwriters*, 289 Conn. at 395.

Defendants argue that the Receiver has failed to state a claim for actual fraud under

section 52-522e(a)(1) because he has not alleged facts showing: (1) that he was a creditor at the

time the alleged fraudulent transfer took place; (2) in which creditor's shoes the Receiver claims

to stand with respect to each challenged transfer or exactly when each creditor's claim arose; (3)

that each transfer was made with fraudulent intent; and (4) that the alleged fraudulent transfers

were directly related to the underlying scheme.  Defendants make similar arguments against the

Receiver's common law fraudulent transfer claims.

*1.   Whether the Receiver has Standing to Bring a CUFTA Claim*

CUFTA Section 52-552e(a)(1) provides that "a transfer made or obligation incurred by a

---

[9] Defendants also argue that the Receiver fails to sufficiently plead the transferees' intent, arguing that Illarramendi successfully concealed his activities from them. *See, e.g.*, Chong Reply Mem. in Support of Mot. to Dismiss at 6.  The complaint, however, alleges that Illarramendi concealed *some* but not all fraudulent activities from defendants.  For example, the complaint alleges that

> The Fraudulent Scheme began at least as early as October 2005, as a result of a major trading loss which Illarramendi chose to conceal.  From that date, Illarramendi, *with the complicity of the HVP Defendants*, embarked on an elaborate scheme . . . [.]

Am. Compl. at ¶ 5 (emphasis added).  Even if the transferees did not share the intent of the transferor, the transfers here were made without substantial consideration and rendered the transferor unable to meet its obligations.

debtor is fraudulent as to a creditor" if:

> [T]he creditor's claim arose before the transfer was made or the obligation was incurred
> and if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to
> hinder, delay, or defraud any creditor of the debtor. . . .

Conn. Gen. Stat. § 52-552e(a)(1).

In order to have standing to bring a claim under CUFTA, a claimant must have been a creditor at the time the alleged fraudulent transfer took place. *Chien v. Skystar Bio Pharm. Co.*, 623 F. Supp. 2d 255, 267 (D. Conn. 2009); *see* Conn. Gen. Stat. § 52-552e(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor [only if] the creditor's claim arose before the transfer was made or the obligation was incurred.").  Defendants argue that the Receiver has failed to allege precisely in whose shoes he was standing and exactly what time each purportedly fraudulent transfer occurred.  The Receiver has alleged that the fraudulent scheme began "at least as early as October 5, 2005," Am. Compl. at ¶ 5, and that the HVP Defendants "were well rewarded" during this period with transfers from receivership entities, which "were themselves in furtherance of the Fraudulent Scheme," Am. Compl. at ¶ 79.  The amended complaint includes a schedule of transfers to defendants made throughout this period.  Thus, although the complaint does not allege exactly when each individual fraudulent transfer took place, the complaint sufficiently alleges that the receivership entities were creditors when many of the fraudulent transfers took place.  Accordingly, the claim should not be dismissed at this stage.[10]

---

[10] The defendants limit their opposition to the Receiver's standing to the issue of *when* a receivership entity became a creditor rather than *if* the receivership entities can be creditors at all. Nevertheless, the Receiver spends much of its opposition brief establishing that, as a general matter, it has standing to bring creditor claims on behalf of HVP Partners.  *See* Rec. Br. at 6-13. The Receiver has alleged that the receivership entities were harmed by the fraudulent transfers, Am. Compl. at ¶¶ 26-27, 79-86, and cites case law from several courts, including the leading case, *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995), establishing that a Receiver may bring

### 2.   Whether the Receiver has Sufficiently Pled Fraudulent Intent

CUFTA also requires that a claimant under section 52-552e(a)(1) allege that the debtor

made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."

Conn. Gen. Stat. § 52-552e(a).  Even assuming that actual intent to defraud must be pled with

specificity, s*ee Nat'l Council*, 259 F. Supp. 2d at 179, a pleader may rely on "badges of fraud . . .

[,] circumstances so commonly associated with fraudulent transfers that their presence gives rise

to an inference of intent." *In re Sharp Int'l*, 403 F.3d 43, 56 (2d Cir. 2005).  Badges of fraud may

include: "a close relationship between the parties to the alleged fraudulent transaction; a

questionable transfer not in the usual course of business; inadequacy of the consideration; . . .

and retention of control of the property by the transferor after the conveyance."  *Id.* (citations

omitted).

Defendants argue that the Receiver has not alleged sufficient badges of fraud.  Lopez,

Luth, and Chong argue that the only badge present is that they were insiders.[11]  They also argue

that the Receiver's allegations that "red flags" should have alerted them, as insiders, to the

fraudulent scheme are insufficient to establish fraudulent intent.  *See, e.g.*, Luth Br. at 14-16

(citing *Stephenson v. PricewaterhouseCoopers, LLP*, 2012 WL 1764191, at *3 (2d Cir. May 18,

2012) ("[P]leading the existence of red flags does not establish that a defendant was aware of

those warning signals.").  In response, the Receiver argues that there is no need to consider

---

claims on behalf of receivership entities used as instrumentalities in furtherance of a Ponzi
scheme.  The Receiver also argues that he has standing as a creditor as a result of his
appointment.  Notably, the defendants' reply briefs do not re-assert a challenge to the Receiver's
standing to bring these claims.  I do not take up these arguments here because defendants have
not raised them in their motion to dismiss.

[11] Lopez, Luth, Chong, and Peláez are insiders of HVP Partners within the meaning of
section 52-552(b)(7) of CUFTA.  Furthermore, this argument is entirely unavailing with respect
to Lopez.  The Receiver alleges that Lopez had actual knowledge of the fraud and was a co-
conspirator in the fraudulent scheme.  Am. Compl. at ¶ 16.

badges of fraud because a "Ponzi presumption" applies. Actual intent to defraud is presumed as a matter of law when the debtor is engaged in a Ponzi scheme because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 8 (S.D.N.Y. 2007); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006).

Defendants contend that Illarramendi's fraudulent scheme was not a "classic" Ponzi scheme and, therefore, the Ponzi presumption does not apply. According to defendants, under the definition of "Ponzi scheme" set forth in *Armstrong v. Collins*, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010), the Receiver must show that (1) deposits were made by investors; (2) the transfers had no legitimate purpose; (3) business operations produced little or no profits or earnings; and (4) transfers to defendants were made with funds received from new investors. Defendants argue that the complaint does not allege that HVP Partners conducted little or no legitimate business operations as represented to investors; business operations produced little or no profits or earnings; or transfers to the defendants were made with funds received from new investors.

There is some merit to defendants' argument, if one defines "Ponzi scheme" narrowly. It may well be true there were some legitimate business purposes entwined in the fraudulent scheme and not all transfers to the defendants were made with funds received from new investors. The case law, however, provides a definition of a Ponzi scheme that encompasses Illarramendi's conduct. Even *Armstrong*, the case from which defendants' definition of a Ponzi scheme is derived, notes that "[c]ase law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi." 2010 WL 1141158, at *23. Indeed, there is no single, authoritative definition of a Ponzi scheme. *See, e.g.*, *In re Parmalat*

*Secs. Litig.*, 477 F. Supp. 2d 602, 608 n.38 (S.D.N.Y. 2007) (a Ponzi scheme "is a scheme whereby a corporation operates and continues to operate at a loss.  The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.  The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.") (citing *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 12 ("[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.") (citations omitted).  The hallmark of a Ponzi scheme is that the entity gives the false appearance of profitability by seeking investments from new sources rather than earning profits from assets already invested.  This is precisely what happened here, even if the scheme was somewhat cloaked by purportedly legitimate activities.

Although Illarramendi may not have mouthed the word "Ponzi" when describing his scheme, he has admitted to conduct described by many courts as amounting to a Ponzi scheme.[12] In *In re Manhattan*, a bankruptcy court reviewed the criminal information to which the alleged Ponzi scheme mastermind had pled guilty and found "ample support" for characterizing his fraud as a Ponzi scheme where he admitted to: falsifying the Fund's performance, sending account

---

[12] Defendants ask that I take judicial notice of Illarramendi's plea documents which, they argue, do not admit to operating a Ponzi scheme.  *See United States v. Illarramendi*, 3:11-cr-00041-SRU (doc. 3, Information; doc. 10, Plea Agreement).  They also ask that I take judicial notice of Illarramendi's purported claims that he was not engaged in a Ponzi scheme.  *See* Declaration of Francisco Illarramendi, *Carney v. Beracha, et al.*, No. 12-cv-00180-SRU (doc. 100-2); Declaration of Francisco Illarramendi, *SEC v. Illarramendi, et al.*, No. 3:11-cv-00078-JBA (doc. 593).  I will do so.

statements to current investors that reflected significant gains, concealing the fund's true state from its auditors, and using falsified records to attract new investors.  397 B.R. at 12.  There is similarly ample support here.  The criminal information charged Illarramendi with: using money provided by new investors to pay out returns he promised to earlier investors, creating fraudulent documents to mislead investors, creditors, and the SEC about the existence of the fund's assets, and falsely representing the amount of capital and credit available to the fund.  Illarramendi's plea agreement includes a stipulation of offense conduct in which he admitted to this charge.

Defendants also argue that the Receiver must allege that the fraudulent transfers were directly related to the underlying scheme, for example, that that there is a connection between the fraudulent conduct alleged in the complaint and the transfer of money.  *See, e.g.*, Luth Br. at 16-17 (citing *In re Sharp Int'l*, 403 F.3d at 56).  The complaint, defendants contend, does not allege facts suggesting that the transfers between HVP Partners and Luth, Lopez, or Chong, were incidental to anything more than an ordinary business relationship.  Defendants' reliance on *Sharp Int'l* is misplaced if the Ponzi presumption applies.[13]  In that case, all the Receiver must show is that the transfers at issue were related to a Ponzi scheme. The Receiver has done so here.  Notwithstanding defendants' attempts to argue that Illarramendi did not engage in a Ponzi scheme, I find that a Ponzi presumption applies and, therefore, the Receiver has sufficiently pled fraudulent intent.

3.   <em>Whether the Receiver has Sufficiently Pled Insufficient Consideration</em>

---

[13] Defendants' reliance on *Sharp Int'l* is also misplaced for another reason.  The Second Circuit did not dismiss the fraudulent conveyance claim because the plaintiff failed to allege a direct connection between the fraudulent transfer and the underlying scheme.  Rather, the Second Circuit affirmed the dismissal of the fraudulent conveyance claim because Sharp's fraud claim related to how Sharp raised funds to further its scheme and not to Sharp's subsequent payment of part of the proceeds to another entity.  *In re Sharp Int'l*, 403 F.3d at 56-57.  Here, the complaint alleges that the transfers to the defendants were made to further the fraudulent scheme.  *See* Am.

Defendants argue that the complaint does not allege facts showing the absence of consideration or that the receivership entities were made insolvent by the transfers. Numerous courts have held that entities used to further Ponzi schemes are presumptively insolvent. *See In re Carrozzella & Richardson*, 286 B.R. 480, 486 (D. Conn. 2002); *Armstrong*, 2010 WL 1141158; *In re Bernard L. Madoff Inv. Securities, LLC*, 458 B.R. 87, 118 (Bankr. S.D.N.Y.), *leave to appeal denied*, 464 B.R. 578 (S.D.N.Y. 2011). Also, the Receiver's complaint alleges that HVP Partners was insolvent at the time it made at least some of the salary and partnership distributions to defendants. *See* Am. Compl. at ¶¶ 107-10. In any case, HVP Partners' ability to meet its obligations must have been limited, to some extent, by the transfers. Millions of dollars were transferred to the defendants. It would be inappropriate to dismiss the Receiver's claim at this stage without additional factual inquiry. Having satisfied the Ponzi presumption, the Receiver has sufficiently pleaded the element of fraudulent intent and alleged the insolvency of the receivership entities. Accordingly, the Receiver has sufficiently stated fraudulent transfer claims under the common law and under CUFTA.

E. Counts Two and Three: Constructive Fraud (CUFTA §§ 52-522e(a)(2) and 52-522f(a))

If actual intent to defraud creditors cannot be proven under CUFTA Section 52-522e(a)(1), a transfer may be avoided under a theory of constructive fraud. The Receiver brings two constructive fraud claims. CUFTA Section 52-552e(a)(2) provides that "a transfer made or obligation incurred by a debtor is fraudulent as to to a creditor" if:

> [T]he creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or

Compl. at ¶¶ 79, 132.

transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. § 52-552e(a)(2).  CUFTA Section 52-552f(a) provides that,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Conn. Gen. Stat. § 52-552f(a).

A constructive fraud claim under section 52-522e(a)(2) differs from CUFTA's actual fraud provision in that the claimant must show that the transfer was made without the creditor receiving a "reasonably equivalent value" in exchange for the transfer.  The proof required to establish that a conveyance was made without substantial consideration is "virtually identical" to the proof required under section 52-552e(a)(2) of CUFTA to establish that the entity did not receive reasonably equivalent value.  *See Nat'l Loan Investors, L.P. v. Lan Assocs. XII, LLP*, 2002 WL 1821298, at * 7 (Conn. Super. Ct. June 28, 2002).  Hence, the analysis above concerning the receipt of "reasonably equivalent value" applies here with respect to the insufficiency of consideration provided in exchange for each transfer.

Defendants argue that the Receiver has failed to plead a plausible claim that the payments to them were not legitimate salary and distributions for services rendered or were designed to defraud HVP Partners' creditors.  *See, e.g.*, Luth Br. at 20-21. In *In re Churchill*, 264 B.R. 303, 308 (S.D.N.Y. 2011), a Southern District of New York bankruptcy court held that failure to allege "unreasonably high or excessive" payment leads to the conclusion that the defendant provided reasonably equivalent value for the services.  Second, defendants argue the Receiver's allegations that defendants failed to exchange reasonably equivalent value necessarily implies that they knew about or recklessly avoided learning about Illarramendi's fraud.

With respect to defendants' first objection, the Receiver has pled a plausible claim that the payments made to defendants were designed to defraud HVP Partners' creditors; that is the substance of the entire complaint.  The Receiver specifically alleges that payments to the defendants were compensation for their participation in a scheme to defraud the creditors.  Furthermore, the complaint alleges millions of dollars of transfers to defendants in exchange for failed services and breaches of fiduciary duties, a de facto overpayment.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. at 113 ("[E]ven if the Defendants' wages were proportionate to the wages of senior management in legitimate enterprises . . . the Defendants returned less than reasonable equivalent value to BLMIS as a result of their alleged lack of faithful service.").  Defendants' second objection improperly attempts to import Rule 9(b)'s pleading standards into a constructive fraud claim.  Whether the allegations here would imply transferee's intent is irrelevant to the constructive fraud claim.  The transferee need only receive a transfer without providing reasonably equivalent value in exchange, thus fraudulent intent is not required and the heightened pleading standards of Rule 9(b) do not apply.

Defendants' strongest argument is that each particular transfer is not fraudulent simply because the "totality of the enterprise" was fraudulent.  Defendants cite *In re Churchill Mort. Inv. Corp.*, which held that "the fact that the debtor's enterprise as a totality operated . . . in a manner that was fraudulent, does not render actually or constructively fraudulent a particular transaction which in and of itself is not fraudulent in any respect." 256 B.R. 664, 681 (S.D.N.Y. 2000) (applying New York law).  The *Churchill* Court ignored the trustee's argument that commissions paid to brokers who unknowingly solicited new customers for a Ponzi scheme were not provided for reasonably equivalent value.  The court noted that the trustee argued that the commissions paid were constructively fraudulent simply because the commissions were paid by

an entity engaged in a Ponzi scheme.  The case before this court is distinguishable, however.

The Receiver is not arguing that the payments to defendants were constructively fraudulent

because they were paid by an entity engaged in a Ponzi scheme.  The Receiver has also alleged

that the transferees are corporate insiders who, even if unaware of the overall scheme, were

intimately involved in it.  In any event, the court in *Churchill* dismissed the claim without

prejudice to the development of new evidence and assertion of additional fraudulent conveyance

claims.  *Id.* at 684.  And, as stated above, I cannot make a finding that defendants' services

constituted adequate value at this stage in the proceedings, because such a determination

involves factual issues that cannot be resolved on a motion to dismiss.  Accordingly, I deny

defendants' motion to dismiss the Receiver's constructive fraudulent conveyance claims.

     F.   Count Five: Breach of Fiduciary Duty

     The Receiver alleges that Lopez, Luth, and Chong breached their fiduciary duties to HVP

Partners and the receivership entities. Defendants, again, attempt to subject the Receiver's claim

to heightened pleading standards.  Chong and Luth also argue that the Receiver must allege facts

in support of the claim that a fiduciary duty existed in a particular employee-employer

relationship.  In Chong's case, he argues that the Receiver's claim is implausible because "other

than alleging Mr. Chong's job titles . . . the Receiver cites no specific facts alleged anywhere in

the Amended Complaint that describe Mr. Chong's formal responsibilities with HVP Partners."

Chong Br. at 22.  Luth argues that the complaint improperly lumps Luth together with other

defendants and fails to give adequate notice of the specific acts he has committed.  Luth Rep.

Mem. in Support of Mot. to Dismiss and to Strike ("Luth Rep. Br") at 9.

     Chong, unlike the other defendants, challenges the claim on the grounds that the Receiver

must allege facts in support of the claim that a fiduciary duty existed in his particular relationship

with HVP Partners.  Chong Br. at 22 (citing *Hoffnaggle v. Henderson*, 2003 WL 21150549, at *7

(Conn. Super. Apr. 17, 2003) ("The existence of a fiduciary duty is largely a factual

determination and the extent of the duty and the resulting obligations may vary according to the

nature of the relationship: the obligations do not arise as a result of labeling, but rather by

analysis of each case."), *reconsid. on other grounds*, 2003 WL 22206236 (Conn. Super. Sep. 10,

2003)).  This is a curious argument, given that Chong was the Chief Financial Officer and Chief

Compliance Officer of HVP Partners.  The case Chong relies on, *Hoffnagle*, involved an

employee of a tax preparation company who the court found had a fiduciary duty to her

employer. The Receiver convincingly argues that "if an employee who prepares tax returns owes

a fiduciary duty to her employer, surely the chief financial officer and chief compliance officer

would owe a much broader duty."  Rec. Br. at 37.  Even though the precise nature of Chong's

fiduciary relationship turns on a factual determination, *see Konover Development Corp. v. Zeller*,

228 Conn. 206 (1994), I can infer from Chong's position as Chief Financial Officer and Chief

Compliance Officer of HVP Partners that he bore some fiduciary duty to HVP Partners.

Similarly, Luth is alleged to have been a portfolio manager and "Head Trader" responsible for

trading decisions.  Because the existence of a fiduciary duty is a factual determination, I decline

to dismiss the Receiver's claims against Luth at this stage.  Accordingly, I deny the defendants'

motion to dismiss the breach of fiduciary duty claim on these grounds.

### G.  Count Six: Unjust Enrichment

The Receiver also seeks to recover under a theory of unjust enrichment against

defendants for their "receipt of money from the receivership entities in the form of loans,

payments, bonuses, compensation, and other Transfers."  Am. Compl. at ¶ 175.  A plaintiff

seeking recovery for unjust enrichment must prove: (1) that the defendants were benefitted, (2)

that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282-83 (1994). Defendants incorrectly argue that there must be a contractual relationship between the parties in order for a plaintiff to recover based on unjust enrichment. Connecticut courts have recognized unjust enrichment claims in the absence of a contract. *Schirmer v. Souza*, 126 Conn. App. 759, 767 (2011) (listing cases). The Receiver has alleged that the defendants received payments, that they were not entitled to those payments, and that they received those benefits at the expense of the receivership entities. Thus, the Receiver has sufficiently pleaded a claim for unjust enrichment.

### H. Count Seven: Constructive Trust

The Receiver requests the imposition of a constructive trust with respect to the transfer of funds, assets, or property from receivership entitles as well as to any profits received by the defendants in the past or in the future in connection with the receivership entities. Am. Compl. at ¶ 184. A constructive trust is a remedy, not an independent substantive cause of action. *Titan Real Estate Ventures, LLC v. MJCC Realty Ltd. P'ship.*, 415 B.R. 29, 44 (D. Conn. 2009) (citing *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 623 n.3 (2002)). I may consider the imposition of a constructive trust as a remedy if the Receiver establishes defendants' liability. Thus, I dismiss this claim and convert it to a request for a remedy.

### I. Count Eight: Conversion

Conversion is "an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights" and requires proof that a defendant's conduct was not authorized. *Mystic Color Lab, Inc. v. Auctions Worldwide LLC*,

284 Conn. 408, 418 (2007); *see also Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 47 (2000).

The Receiver alleges that defendants converted the assets of the receivership entities when they received money misappropriated from the receivership entities.  Am. Compl. at ¶ 188.  Defendants argue that this allegation is insufficient to show that transfers were not authorized by HVP Partners or any other entity because the complaint alleges only that Illarramendi controlled the entities, orchestrated transfers to defendants, and approved the transactions.  The Receiver responds that the allegations (1) that the receivership entities were operated as a Ponzi scheme and (2) transfers to defendants were made with misappropriated funds are sufficient to plead that the transfers were unauthorized.  It is clear to me that HVP Partners could not authorize any of the defendants to accept transfers of misappropriated funds.  And it is obvious that Illarramendi could not authorize the defendants to accept transfers enmeshed in his fraudulent scheme.  If, as the complaint alleges, the transfers were made as part of a Ponzi scheme, or at least as part of a fraudulent scheme, and, therefore, were misappropriated, a reasonable jury could find that Illarramendi acted outside the scope of his authority when making them.  In any event, whether the transfers were authorized or not presents an issue of fact not appropriately resolved at this stage in the proceedings.

Additionally, defendants argue that the conversion claim should be dismissed because excessive compensation is not a proper basis for a conversion claim.  To dismiss on this ground would require me to hold, as a matter of law, that the transfers were bona fide compensation.  That determination involves disputed issues of fact.  Defendants also argue that the Receiver has not alleged that the transferred money is specifically segregated or identifiable.[14]  To prevail on a

---

[14] Notwithstanding defendants' objections, it appears to me that the complaint has

claim for conversion, a party "must prove a sufficient property interest in the property in question." *Mystic*, 284 Conn. at 419.  The Receiver's documentation of fraudulent transfers in the amended complaint has sufficiently identified monies subject to the conversion claim. Accordingly, I deny defendants' motion to dismiss the Receiver's claim for conversion.

J.   Count Nine: Accounting

The Receiver requests that the defendants provide an accounting of any transfer of funds, assets, or property received from the receivership entities as well as an accounting of any past and future profits received in connection with the receivership entities.  Defendants argue that a request for an accounting is a remedy, not a substantive cause of action.[15]  Each relies on a footnote in a Connecticut Supreme Court case.  *See Macomber*, 261 Conn. at 623 n.3.  The Receiver responds that an accounting is a recognized action under Connecticut law and that there is no appellate authority clarifying the *Macomber* footnote.  Additionally, the Receiver argues that accounting is a cause of action where "the facts create a reasonable doubt whether adequate relief may be obtained at law." Receiver Br. at 49 (citing *Makert v. Elmatco Prods., Inc.*, 84 Conn. App. 456, 460 (2004)).  I need not resolve today the question whether an accounting is a valid cause of action.  The pendency of that claim will not affect the scope or cost of this litigation.  Accordingly, I deny the motions to dismiss the accounting claim without prejudice to renewal at summary judgment, by which time the law may have developed further.

---

sufficiently identified the unauthorized assets.  *See, e.g.*, Am. Compl. at ¶¶ 80-86, 88, 91, 94, 96-97, 99, 101, 104, 108-09.  Also, the cases defendants cite were not resolved before development of the facts.  *See In re Flanagan*, 415 B.R. 29 (D. Conn. 2009) (affirming grant of summary judgment); *Mystic Color Lab*, 284 Conn. 408 (reversing in part judgment of trial court); *Vanguard Engineering, Inc. v. Anderson,* 83 Conn. App. 62 (2004) (Appellate Court reversed judgment and remanded for new trial); *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 47 (2000) (on appeal after jury trial).

[15] Luth, however, appears to concede that an accounting is a substantive cause of action. *See* Luth Br. at 31.

K.  <u>Statute of Limitations</u>

A court may dismiss on statute of limitations grounds where facts supporting a statute of limitations defense are set forth in papers filed by plaintiff himself.  *Walters v. Indus. & Commercial Bank of China*, 651 F.3d 280, 293 (2d Cir. 2011).  The original complaint was filed on February 3, 2012 and the amended complaint was filed on June 22, 2012.  The transfers that form the basis of defendants' liability were made on dates ranging from September 27, 2005 to March 30, 2011 (Lopez), July 20, 2005 to April 26, 2011 (Luth); July 22, 2005 to the year 2011 (Chong); November 1, 2005 to May 22, 2008 (Peláez and Barrantes).  Am. Compl., Ex. A. Defendants seek to dismiss all or part of each claim as barred by the applicable statutes of limitations.

1.  *Count One: Actual Fraud (§ 52-552e(a)(1))*

The HVP Defendants seek to dismiss Count One to the extent the Receiver seeks to avoid transfers of salary, partnership distributions, or bonuses made before February 3, 2008— four years before Receiver filed his complaint.  The Receiver invokes the so-called "discovery rule" of sections 52-522e(a)(1) and 52-552j of CUFTA and argues that the applicable statute of limitations is one year from the appointment of the Receiver.  Under the discovery rule, an action is timely if brought within one year of the date on which the fraud could reasonably have been discovered by the claimant. *See Epperson v. Entm't Express, Inc.*, 338 F. Supp. 2d 328, 344 (D. Conn. 2004), *aff'd sub nom. Epperson v. Entm't Exp., Inc.*, 159 Fed. App'x 249 (2d Cir. 2005). The Receiver's actual fraud claim was brought on February 3, 2012, within one year of the Receiver's appointment on February 3, 2011, and is therefore timely.  Defendants' motions to dismiss the Receiver's CUFTA actual fraud claims are denied.

2.  *Counts Two and Three: Constructive Fraud (CUFTA §§ 52-552e(a)(2) and 52-552f(a))*

- 29 -

The constructive fraud claims each have a four-year statute of limitations.  Conn. Gen. Stat. § 52-552j(2).  The Receiver concedes defendants' arguments with respect to Counts Two and Three and only brings claims to recover transfers made within the applicable statute of limitations, that is, on or after February 3, 2008.  Thus, the Receiver's constructive fraud claims are timely to the extent they relate to transfers made on or after February 3, 2008.

### 3. Counts Four, Five, Six, Seven, and Eight: Common Law Fraud, Breach of Fiduciary Duty, Unjust Enrichment, Constructive Trust, and Conversion

Under Conn. Gen. Stat. § 52-577, tort claims, including common law fraudulent transfer (Count Four), breach of fiduciary duty (Count Five), and conversion (Count Eight) must be brought within three years.  Defendants argue that the unjust enrichment claim (Count Six) is also subject to a three-year statute of limitations.  The Receiver only brings his common law fraud claim to recover transfers made during limitations period.  Rec. Br. at 50.  The unjust enrichment claim is equitable in nature and, thus, the court need not adhere to definitive statutes of limitation.  *See Rossman v. Morasco*, 115 Conn. App. 234, *cert. denied*, 293 Conn. 923 (2009) ("Although courts in equitable proceedings often look by analogy to the statute of limitations to determine whether, in the interests of justice, a particular action should be heard, they are by no means obliged to adhere to those time limitations.") (citations omitted).  Likewise, to the extent it is imposed by a court acting under its equitable powers, the remedy of constructive trust (Count Seven) has no statute of limitations. *See Cendant Corp.*, 474 F. Supp. 2d at 383.

As a result, because there were no transfers to Peláez and Barrantes during the three-year period prior to commencement of this action, Counts Five and Eight against them are dismissed as time-barred.  Counts Five and Eight against the HVP Defendants, however, are timely.

Defendants' motions to dismiss the unjust enrichment claim or the request for imposition of a

constructive trust are denied.

> ### 4.   Count Nine: Accounting

An action for accounting has a statute of limitations of six years.  Conn. Gen. Stat. § 52-

576.  Defendants argue that, to the extent it is a cause of action, an accounting is subject to a six-

year statute of limitations and move to dismiss portions of the claim for an accounting with

respect to any transfer of assets occurring prior to February 3, 2006.  The Receiver does not

contest defendants' motion to dismiss that portion of the accounting claim.  To the extent that the

Receiver's accounting claim relates to actions occurring on or after February 3, 2006, it is timely.

## L.   Luth's and Lopez's Motions to Strike

Luth and Lopez move to strike portions of the complaint.  Luth asks the court to strike as

immaterial paragraphs 102 to 104 of the complaint, which describe a transaction in which Luth's

family members were permitted to use receivership entities for personal benefit.  Luth Br. at 33.

Those allegations are material to the complaint because they describe a transaction in which Luth

breached a fiduciary duty to HVP Partners in order to enrich his spouse.  Lopez moves to strike

"immaterial, impertinent, and scandalous" statements in the complaint, arguing that they are

unnecessary, overblown, irrelevant, and used only to inflame or prejudice the reader.  Lopez

Mot. to Dismiss at 1-2; *See* Lopez Mem. in Support of Mot. to Dismiss and to Strike ("Lopez

Br.") at 22-24.  Although Lopez objects to the Receiver's alleged "editorializing," I do not

believe that in view of the other allegations levied in the complaint, the specified allegations

inflame or prejudice the reader sufficiently to justify striking them.  Defendants also move to

strike on grounds of prejudice comments concerning their choice to invoke Fifth Amendment

protections.  Acknowledgment of the defendants' invocation of their right against self-

incrimination to draw an adverse inference, however, is entirely appropriate. *See LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) ("[W]hile the Fifth Amendment precludes drawing adverse inferences against defendants in criminal cases, it does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.") (internal quotations and citations omitted); *see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 153 (D. Conn. 2009). Accordingly, I deny defendants' motions to strike.

## V.      Conclusion

For the reasons stated above, I grant in part and deny in part the following motions: doc. 69 (Peláez and Barrantes' motion to dismiss), doc. 71 (Lopez's motion to dismiss and motion to strike), doc. 72 (Chong's motion to dismiss), doc. 73 (Luth's motion to dismiss and motion to strike).

It is so ordered.

Dated at Bridgeport, Connecticut, this 28th day of March 2013.


                                                        /s/ Stefan R. Underhill
                                                        Stefan R. Underhill
                                                        United States District Judge